Argued and submitted August 25, 1986, reversed and remanded for trial September 9, reconsideration denied November 20, petition for review allowed December 22, 1987
(304 Or 547)

**STATE OF OREGON,**
*Appellant,*

*v.*

**JON BRIDEWELL,**
*Respondent.*

(1233; CA A38352)

742 P2d 648

David Schuman, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

John R. Faust, Jr., Portland, argued the cause for respondent. With him on the brief was Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Before Warden, Presiding Judge, and Van Hoomissen and Young, Judges.

VAN HOOMISSEN, J.

Young, J., dissenting.

## VAN HOOMISSEN, J.

The state appeals from a pretrial order suppressing evidence seized after a warrantless entry into a "shop" on defendant's property. The dispositive issue is whether the deputies were lawfully in the shop when they inadvertently saw marijuana in plain view. We are bound by the trial court's determination of what actually happened, but not by the court's legal conclusions. Our function is limited to determining whether the legal principles were correctly applied. *State v. Davis*, 295 Or 227, 238, 666 P2d 802 (1983); *State v. Warner*, 284 Or 147, 585 P2d 681 (1978).

Defendant lives alone in a remote area of Wallowa County. Because the road to his property is often difficult to travel, in June, 1985, United Parcel Service asked Rosalee Allen, defendant's friend, who lives in Enterprise, to accept delivery of some packages for him. She consented and telephoned defendant's house to inform him. He did not answer. She left a message for him on his telephone answering machine. He did not call back. Over the next three to four days, she tried repeatedly, but unsuccessfully, to reach him by telephone. Allen became concerned about defendant's welfare. She knew that he was in poor health, that he often engaged in solitary and dangerous logging on his land and that he had been the object of murder threats.

Between 8 and 9 p.m. on the evening of June 16, Allen and her son drove to defendant's property. What she saw there heightened her concern. His dogs were chained to his front porch and were unattended. The front door was open and both of his pickups were gone. She called out for him, but received no answer. She entered the house and found it quite a bit messier than usual. "There was stuff all over the floor, paper, plates, clothes were kind of thrown around." She could not get the bathroom door open. An empty pistol holster was lying on the couch. "That raised [her] concerns about what might have happened to him."

Allen then drove down to defendant's shop, which is located about 125 yards from his house, and shined her truck's lights inside. It was very dark outside. The shop also was dark; it appeared empty. Again, she called out for him, but received no answer. She also went to a shed, where defendant kept wolves in a fenced area. Again, she called for defendant; there was no answer. She grew more concerned for defendant's condition, because "he has frequent headaches and [she] thought

that if he had been out logging and alone in the woods he could be hurt or [she] thought somebody had hurt him." He had told her that some people had threatened to kill him.

Allen and her son then drove back to Enterprise and reported her concern to the sheriff's dispatcher. Deputy Wagner, who was on patrol in Joseph at that time, drove to the Sheriff's office in Enterprise to take Allen's full statement. She told Wagner that she thought defendant may have been injured or that somebody may have done something to him, and that defendant's house "looked like [it] had been ransacked, it was a mess." She wanted Wagner to go there immediately. She was "very concerned," and had "never been so scared in her life."

It was about 10 p.m. and dark, and Sheriff's department policy favored daylight investigations. Wagner testified that, if he had had a four-wheel drive vehicle available that evening, he was sure that he would have gone to defendant's property immediately, but probably not alone. Allen had told Wagner that the road to defendant's house had been washed out and that he would need a four-wheel drive vehicle to get to the property. No four-wheel-drive vehicle was then available. About 11 p.m., Wagner contacted deputy Prince, who was in Wallowa and had a four-wheel drive vehicle. He agreed to meet Wagner in Enterprise about 9 the following morning. The deputies were concerned about their own personal safety.[1]

---

[1] On direct examination, Wagner testified:

"Q. What's the general rule on going at night or during the day on—on these kinds of things?

"A. We usually try to go in daylight hours.

"* * * * *

"A. Well, we didn't know what we were going to run into. So, we decided probably that at least two people should go and that we would go in the daylight.

"Q. Did the fact that she hadn't seen a body or—or had [not] seen any—eyewitnessed any violence influence that decision not to go that night?

"A. Yes."

On cross-examination, Wagner testified:

"Q. Officer, is it your testimony that the police only operate during the daylight hours or investigate crimes during the daylight hours?

"A. No. But, in a situation that we don't know what we're going to run into, we try to go in daylight hours."

Deputy Prince testified:

"Q. Okay. What was the reason that you didn't go up [to defendant's property]

Wagner told Allen that they would go to defendant's place first thing the next morning.

Early the following morning, deputies Wagner, Prince and Young drove to defendant's property. When they arrived, they found conditions outside the house as Allen had described them. Both of defendant's dogs were still chained to the front porch; they looked thin. There was no food or water around. The deputies bypassed the dogs, went on the porch and called out defendant's name. Receiving no response, they walked around the house and again called out for defendant. No one answered. They entered the house and saw "clothes, dishes, various types of paper and old books, garbage paper, dog droppings, and stuff like that scattered throughout the house." An empty pistol holster was on the couch. They then checked the upstairs rooms, but found no one. They went outside and walked around the house towards the horse corral. They saw defendant's shop, through the trees. They then walked to the shop.

The shop consists of a large room with garage-sized doors at each end, with several smaller rooms off the large one. As the deputies entered the large room, they saw that a light was on, and noises were coming from within a room. They walked toward the noise and, in the process, looked into an open room. One of them recognized marijuana plants and grow lights about ten feet away. The deputies called out defendant's name. He emerged from the open room and closed the door behind him. They asked his consent to enter that room; he declined. The deputies entered the room and found about 350 marijuana plants. They arrested defendant and seized the marijuana plants and paraphernalia used in its cultivation.

The trial court stated, in relevant part:

> "[I]t appears to the Court that at the time this welfare check occurred and specifically with respect to entry into the garage, there was no evidence of anyone in need of immediate aid. There was no compelling need to assist any persons within or any urgent need to render aid and assistance. * * *.

that night? Did you consider that a possibility?

"A. Not at that time. It didn't seem like that big of an emergency. We decided we—it was enough so that we'd follow up on it in the daylight hours for helpfulness in seeing what was around *and our own personal safety*." (Emphasis supplied.)

"And so the Court finds that there was no legal and valid intrusion into the shop.

"* * * * *

"And it's my finding that exigent circumstances did not exist for the seizure of the plants at that time and that the proper procedure would have been for the officers to have gone back and received a Search Warrant to search the room. * * *

"Mr. Bridewell was under arrest. He wasn't going anywhere and I don't think that the premises were in jeopardy. I don't think there was any (inaudible word) evidence that the evidence was going to be destroyed or that it would be lost.

"And so I'm going to allow the motion to suppress and will enter an order at this time.

"I just—There's no reason that—As I view this, there's no reason why a warrant was not obtained because they certainly had probable cause."

The state contends that the trial court erred in suppressing the evidence. It argues that, either under the emergency doctrine or in the exercise of their community caretaking function, the deputies were lawfully in defendant's shop when they inadvertently saw marijuana in plain view. Defendant argues that no emergency existed and that, therefore, the warrantless seizure was unlawful. Defendant relies primarily on *State v. Atkinson,* 298 Or 1, 688 P2d 832 (1984), *State v. Davis, supra,* and *State v. Walle,* 52 Or App 963, 630 P2d 377 (1981).

On these facts, it makes no sense to speak of warrants or the warrant requirement. When they first went to defendant's property, the deputies did not have probable cause to seek a warrant to search for any purpose. Therefore, no search warrant could have issued. *See* ORS 133.555(2); ORS 133.535; *State v. Atkinson, supra; see South Dakota v. Opperman,* 428 US 364, 370 n 5, 96 S Ct 3092, 49 L Ed 2d 1000 (1976) (probable cause inapplicable in noncriminal situations). Therefore, the case must be decided on the basis of reasonableness. *See State v. Newman,* 292 Or 216, 221, 637 P2d 143 (1981); *State v. Tourtillott,* 289 Or 845, 865, 618 P2d 423 (1980). Was it reasonable for the deputies to go to defendant's property in response to Allen's plea? We conclude that it was reasonable.

## Plain View Doctrine

■■ The plain view doctrine provides that objects falling within the plain view of an officer who has the right to be in a position to have that view may be seized without a warrant. The doctrine is concerned with seizures. It assumes that the officer is already lawfully in a constitutionally protected place. It has three requirements: (1) a valid intrusion, (2) an inadvertent discovery[2] and (3) that what the officer sees is evidence. *See Texas v. Brown,* 460 US 730, 737, 103 S Ct 1535, 75 L Ed 2d 502 (1983); *Coolidge v. New Hampshire,* 403 US 443, 465-68, 91 S Ct 2022, 29 L Ed 2d 564 (1971); *State v. Roles,* 75 Or App 63, 66, 705 P2d 227 (1985); *State v. Illingworth,* 60 Or App 150, 652 P2d 834 (1982), *rev den* 294 Or 569 (1983); *State v. Walle, supra,* 52 Or App at 967; *State v. Sagner,* 12 Or App 459, 472, 506 P2d 510, *rev den* (1973). In this case, the trial court found that the second and third requirements had been satisfied. There is evidence in the record to support those findings, and we are bound by them. *State v. Warner, supra; Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968). Therefore, we need only to determine whether the deputies were lawfully in defendant's shop when they saw the marijuana in plain view.

## Community Caretaking Function

The concept of a police community caretaking function was recognized in *Cady v. Dombrowski,* 413 US 433, 441, 93 S Ct 2523, 37 L Ed 2d 706 (1973):

> "Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."

In *State v. Atkinson, supra,* 298 Or at 9 n 4, the Supreme Court noted the possible validity of a warrantless search in a non-criminal, nonemergency context. In *State v. Walker,* 135 Or 680, 296 P 850 (1931), a sheriff noticed that a party was going

---

[2] The so-called "inadvertent discovery" prong has never been accepted by a judgment supported by a majority of the United States Supreme Court. *See Arizona v. Hicks,* 480 US ___, ___, 107 S Ct 1149, 94 L Ed 2d 347, 357 (1987) (White, J., concurring).

on in a long-abandoned building owned by the defendant. Not suspecting him of any crime, the sheriff entered the building in order to make a routine check and found the defendant in possession of illegal liquor. The seizure was upheld:

> "This was such an unusual occurrence that the sheriff might well be induced to make inquiries. It would be considered a very reasonable thing for him to do. * * * The sheriff was not in search of evidence of any particular crime, but having entered and found a crime being committed in his presence, he had a right to take the steps which he had taken." 135 Or at 685.

Without using the term "community caretaking function," we recognized in *State v. Rounds,* 73 Or App 148, 154, 698 P2d 71, *rev den* 299 Or 663 (1985), that police may become involved in a "noninvestigative, nonemergency search." *See State v. Apodaca,* 85 Or App 128, 133, 735 P2d 1264 (1987).[3]

█     The validity of a warrantless search is tested against a standard of reasonableness. The test is an objective one based on the totality of the facts and circumstances known to the police at the time. What could the deputies have done in the face of Allen's report? Would a reasonable person, objectively viewing the facts and circumstances known by the deputies, have concluded that an investigation into defendant's circumstances was reasonable?

When the deputies went to defendant's property, they had been told: (1) defendant's friend was very concerned after she had been unable to contact him for several days, after repeatedly telephoning his house and leaving messages on his telephone answering machine, and after personally searching for him on his property; (2) he lived alone in a remote wilderness area; (3) he was in poor health; (4) he often engaged in solitary and dangerous logging on his land; (5) he had been the object of murder threats; (6) the front door of his house was

---

[3] *See also United States v. Miller,* 589 F2d 1117, 1125 (1st Cir 1978), *cert den* 440 US 958 (1979); *State v. Perry,* 298 Or 21, 26, 688 P2d 827 (1984); *State v. Davis, supra,* 295 Or at 238; *State v. Newman, supra; State v. Okeke,* 82 Or App 393, 728 P2d 872 (1986), *rev allowed* 303 Or 261 (1987); *State v. Fleming,* 63 Or App 661, 665 P2d 1235 (1983); *State v. Walle, supra,* 52 Or App at 967; *State v. Thirdgill,* 46 Or App 595, 613 P2d 44 (1980); *State v. Jones,* 45 Or App 617, 620, 608 P2d 1220, *rev den* 289 Or 337 (1980); *State v. Frink,* 42 Or App 171, 176, 600 P2d 456 (1979); *State v. Plant,* 28 Or App 771, 773, 561 P2d 647 (1977); *Crauthers v. State,* 727 P2d 9 (Alaska App 1986); *see also,* 1 LaFave, *Search and Seizure* § 6.6(c) (2d ed 1987).

open, the house had looked to Allen like it had been "ransacked" and the bathroom door was blocked; (7) his dogs were chained to his porch and were unattended; (8) both of his pickups were gone; (9) an empty pistol holster was found by Allen on the couch in the living room; and (10) defendant was nowhere to be found.[4]

Defendant does not argue that the deputies went to his place as a subterfuge or on a pretext to investigate or to search for evidence of any known or suspected crime, or that the scope of the deputies' inquiry in response to Allen's plea was greater than was necessary.[5] Neither does he argue that the police created the exigency. We conclude that a reasonable person would have thought that, in the exercise of their community caretaking function, the deputies should have gone to defendant's property. We find no strong and compelling reason to adopt a narrow and impractical analysis of the community caretaking doctrine, which would not serve the public interest. Rather, applying a rule of reasonableness, we conclude that Allen's report gave the deputies a reasonable basis to do what they did, especially as it was progressively confirmed in every detail on the site.

---

[4] The American Bar Association's Standard for Criminal Justice, Urban Police Function, states that the twenty-four hour, seven-day a week availability of police to provide assistance to persons in need of help for countless noncriminal, noninvestigative reasons makes it natural that citizens turn to the police under circumstances like these.

[5] During oral argument in this court, defendant's counsel conceded that the deputies were lawfully on defendant's property:

"I'm saying that [the deputies] are there properly. They can come on my property if I am not around. They are welcome to do that. They can't be sued for trespass, I can't bring charges against them if they do that * * *."

"* * * * *

"[The deputies] were there I would say, lawfully in the sense that you could not bring charges against them. You couldn't sue them for damage. * * *"

Notwithstanding, counsel argued that the deputies should have obtained a warrant before they *seized* the evidence:

"Why couldn't they get a warrant here? There is no evidence indicating that they couldn't get a warrant in this situation. Why couldn't they? Why couldn't they go and get it? They had seen it, come back and just say that the guy had four plants. We looked in the door and we saw 349 more. He's got 353 more marijuana plants. Is there a judge in the state that wouldn't give him a warrant and there is no evidence as to why they couldn't just go get a warrant."

Counsel also recognized that police have a "caretaker" function, although he argued that it did not extend to real property.

■     The trial court's conclusion that the seizure of the marijuana plants was unlawful *even if* the deputies were lawfully in defendant's shop is clearly wrong. If the deputies were lawfully in defendant's shop, the plants and grow lights were in plain view and the discovery was inadvertent. The deputies immediately recognized the marijuana plants and grow lights as such. Therefore, immediate seizure was lawful. *See Coolidge v. New Hampshire, supra,* 403 US at 465-71; *State v. Keller,* 265 Or 622, 628, 510 P2d 568 (1973); *State v. Roles, supra,* 75 Or App at 66; *State v. Wyman,* 59 Or App 542, 546, 651 P2d 195 (1982); *State v. Walle, supra,* 52 Or App at 967. That the deputies could have obtained a warrant to seize the plants is simply irrelevant. *See Illinois v. Lafayette,* 462 US 640, 647, 103 S Ct 2605, 77 L Ed 2d 65 (1983); *Coolidge v. New Hampshire, supra,* 403 US at 509.

    For the same reasons, the search and seizure also were lawful under the Fourth Amendment. *See Cady v. Dombrowski, supra; New Jersey v. T.L.O.,* 469 US 325, 105 S Ct 733, 83 L Ed 2d 720 (1985); *Delaware v. Prouse,* 440 US 648, 99 S Ct 1391, 59 L Ed 2d 660 (1979); *United States v. Martinez-Fuerte,* 428 US 543, 96 S Ct 3074, 49 L Ed 2d 1116 (1976); *United States v. Brignoni-Ponce,* 422 US 873, 95 S Ct 2574, 45 L Ed 2d 607 (1975); *Almeida-Sanchez v. United States,* 413 US 266, 277, 93 S Ct 2535, 37 L Ed 2d 596 (1973) (Powell, J., concurring); *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968); *Camara v. Municipal Court,* 387 US 523, 87 S Ct 1727, 18 L Ed 2d 930 (1967). Therefore, the trial court erred in allowing defendant's motion to suppress.[6]

    Reversed and remanded for trial.

    **YOUNG, J.,** dissenting.

    In *State v. Newman,* 292 Or 216, 637 P2d 143 (1981), *cert den* 457 US 1111 (1982), the court held that the conduct of the police in dealing with persons in nonemergency, noncriminal situations is to be tested by a standard of reasonableness. *See State v. Perry,* 298 Or 21, 26, 688 P2d 827 (1984). That rule has been applied to a search of a person's purse for

---

[6] Because we hold that the deputies were lawfully in defendant's shop pursuant to their community caretaking function, it is unnecessary for us to consider whether they also were there lawfully pursuant to an emergency. *See State v. Davis, supra; State v. Apodaca, supra,* 85 Or App at 131.

identification before transportation to a treatment center, *State v. Newman, supra,* 292 Or at 222 (where the action was held to be unreasonable as a matter of law), to an inventory search of luggage belonging to a person temporarily detained for detoxification, *State v. Perry, supra,* 298 Or at 27 (where it was held unreasonable to open a closed container), to a search of a purse of a detainee on a civil hold, *State v. Okeke,* 82 Or App 393, 401, 728 P2d 872 (1986), *rev allowed* 303 Or 261, 735 P2d 1224 (1987) (where it was held unreasonable, because it was not necessary for treatment), and to a search of a backpack to identify its owner. *State v. Rounds,* 73 Or App 148, 154, 698 P2d 71, *rev den* 299 Or 663 (1985) (where it was held unreasonable to open a closed container found in a backpack). The majority now holds that a nonemergency, noncriminal search of a *home*[1] does not violate Article I, section 9, if it is an exercise of the state's "community caretaking" function. I believe that *State v. Davis,* 295 Or 227, 666 P2d 802 (1983), and *State v. Atkinson,* 298 Or 1, 688 P2d 832 (1984), foreclose the result reached by the majority, and I therefore dissent.

In *Davis,* the court adopted the "emergency doctrine" exception to the warrant requirement of Article I, section 9. Under that doctrine, police officers may enter a residence without a warrant to render emergency aid if they reasonably believe that there is an urgent need for immediate action to protect life or property. A remote possibility of harm cannot justify a warrantless entry into a home; the Oregon Constitution demands that a warrant be issued, unless there are articulable facts showing a compelling and urgent need for the entry. *State v. Davis, supra,* 295 Or at 243. The rule that the majority adopts is inconsistent with *Davis,* because it authorizes entry on something less than an urgent need to render aid and assistance.

Even if *Davis* does not preclude an extension of the holding in *State v. Newman* to searches of dwellings, the search here does not satisfy the requirements of *State v. Atkinson, supra. Atkinson* holds that a non-criminal, non-

---

[1] The state did not argue below that the shop was not part of defendant's home or within its curtilage. *See Oliver v. United States,* 466 US 170, 180, 104 S Ct 1735, 80 L Ed 2d 214 (1984); *State v. Russo,* 68 Or App 760, 683 P2d 163 (1984). I therefore treat the shop as part of defendant's home.

emergency inventory is valid only if (1) it is conducted pursuant to a properly authorized administrative program which is designed and systematically administered to limit the exercise of discretion by the law enforcement person conducting the search and (2) the scope of the search is reasonable in relation to its purpose.[2] *See also State v. Rounds, supra,* 73 Or App at 154. Because there is *no* evidence that the officers entered the shop pursuant to an administrative program that limited their discretion, the majority's result is inconsistent with *Atkinson.*

For these reasons, I would reject the state's "community caretaking" argument. The only remaining issue is whether the search was valid under the "emergency doctrine" exception to the warrant requirement. I agree with the trial court that the facts do not evidence a compelling and urgent need for the entry. The officers waited 12 hours before going to defendant's house. The condition of the house *at best* indicated that something had already happened to defendant; nothing indicated a situation in which the officers could have intervened to protect life or property. The "emergency doctrine" therefore does not apply, and the officers were not lawfully in the shop.

I would affirm.

---

[2] *Atkinson* imposed a third requirement: that the property searched be lawfully in police custody. That requirement makes sense in the inventory context of *Atkinson,* but not when the property to be searched is a dwelling, as here.