Argued and submitted July 28, 1986, resubmitted In Banc September 9, 1987, affirmed May 11, 1988

## STATE OF OREGON,
*Appellant,*

*v.*

## FRANK GILBERT WALES,
*Respondent.*

### (C85-08-33285; CA A37897)

755 P2d 704

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Sally L. Avera, Salem, argued the cause for respondent.

With her on the brief was Gary D. Babcock, Public Defender, Salem.

JOSEPH, C. J.

Deits, J., dissenting.

## JOSEPH, C. J.

In this prosecution for possession of controlled substances, ORS 475.992, the state appeals from an order suppressing evidence obtained when defendant was searched. The state raises two issues: (1) whether the stop and the search were supported by a reasonable suspicion that defendant was armed and dangerous; and (2) whether the opening of a small metal box that was seized from defendant's pocket was lawful. We affirm.

Officer Larson stopped defendant's car because it had a defective brake light. As he approached the car, he recognized defendant. He had previously dealt with him and believed him to be a "methamphetamine dealer."[1] He also said that he knew that the police had found a large cache of weapons at defendant's residence a few months earlier. He testified that, as he approached the driver's window, he was "a little more nervous than he was at the beginning of the stop," because he believed that "methamphetamine people"[2] tend to be "paranoid" and that they frequently possess "guns and knives."

Larson requested defendant's driver's license. When defendant replied that he had neither a license nor any identification, Larson asked that he get out of the car. When asked if he had any weapons, apparently after he was out of the car or while he was getting out of the car, defendant replied that, as the officer put it, he had "some knives on him."

Larson then patted him down and removed from his right front pants pocket a knife and a flat gold-colored box. He placed them on the trunk lid. He then removed two knives[3] and a bag, which turned out to contain less than one ounce of marijuana, from defendant's left-front pocket and also placed them on the trunk lid. He opened the box and found codeine and a small bag containing a white powder. Larson testified that he opened the box because "[t]here may have been some

---

[1] The officer first identified defendant only as a dealer, but the testimony makes clear that he regards dealers and users as indistinguishable "methamphetamine people." Later in his testimony, he expressly stated: "He is a user, sir, to my knowledge."

[2] *See* n 1, *supra.*

[3] All of the knives were, as the officer acknowledged, "legal." He admitted that he knew by feeling through the cloth of defendant's pants that the knives were "legal."

more marijuana in that little box or more drugs of some kind or evidence of possession * * *." He then put defendant in the back of the patrol car, advised him of his rights and obtained his consent to have the powder tested; it proved to be methamphetamine. He cited defendant for possession of less than one ounce of marijuana, driving with a defective brake light and operating with an expired operator's permit, gave him back the knives and released him.

■        The initial stop of defendant's vehicle was lawful, because Larson had observed that it had a defective brake light. When he discovered that defendant was driving without a permit, he had reason to believe that defendant had committed the Class C misdemeanor of failing to carry or present a license to a police officer. ORS 807.570; ORS 161.515; ORS 131.605(1). The state argues that ORS 131.615[4] then became applicable and furnishes the statutory basis for all that followed, including, of course, the search, purportedly pursuant to ORS 131.625.[5]

There are a number of difficulties with the state's argument. In the first place, if it is the state's position that the relevant stop occurred at the outset in respect to the defective brake light, then very plainly an inquiry about whether defendant possessed a weapon exceeded the permissible scope of the inquiry allowed under ORS 131.615(3). If the state relies on the direction by Larson that defendant get out of his car as being the relevant stop, then it would be necessary to determine what was the "crime" that Larson reasonably suspected

---

[4] ORS 131.615 provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

[5] ORS 131.625 provides:

"(1) A peace officer may frisk a stopped person for dangerous or deadly weapons if the officer reasonably suspects that the person is armed and presently dangerous to the officer or other person present.

"(2) If, in the course of the frisk, the peace officer feels an object which the peace officer reasonably suspects is a dangerous or deadly weapon, the peace officer may take such action as is reasonably necessary to take possession of the weapon."

that defendant had committed, aside from the one for which the vehicle was stopped or which defendant had committed by not having or displaying an operator's permit. The state does *not* argue that the possession of the knives gave rise to a reasonable suspicion that defendant had committed or was committing a crime.

The record concerning the circumstances at the time and place shows that defendant was ordered out of the car *because* he did not have a driver's license or other identification.[6] That had supposedly added to Larson's existing

---

[6] "THE COURT: Let me, in sequence you saw this brake light didn't work, you stopped the car, you recognized Mr. Wales, you asked him if he had a license and he indicated to you that he did not have any on him, that in fact had expired and he had no other I.D.; is that correct?

"THE WITNESS: Correct.

"THE COURT: At that point in time what were you focusing your attention as far as ----

"THE WITNESS: At that point for any ----

"THE COURT: — citing him?

"THE WITNESS: At that point he would have been cited for no operator's license.

"THE COURT: Um, at that point in time were you threatened in any way?

"THE WITNESS: Made no threatening moves at all.

"THE COURT: Would you, other than the fact you had known this man, would you at all have been apprehensive?

"THE WITNESS: I was very apprehensive.

"THE COURT: Why, what did you think was going to happen or could happen?

"THE WITNESS: What could happen? It was well within reason he had a weapon in the car.

"THE COURT: Let's assume he did, why would that be a concern to you?

"THE WITNESS: Because I don't know what paranoia, what a methamphetamine addict has, would cause him to do. It's a side-effect of methamphetamine.

"THE COURT: You indicated that man was a dealer; you indicated he was a user. Are they synonymous?

"THE WITNESS: He is a user, sir, to my knowledge.

"THE COURT: So you everytime you give a traffic ticket to — about to give a traffic ticket to a person that you know to have used methamphetamine pat them down?

"THE WITNESS: Not every one, but the ones that I know and have had dealings with, some I have taken weapons.

"THE COURT: Have you ever seen weapons?

"THE WITNESS: No.

nervousness about defendant, but he admitted on cross-examination that his "fear," such as it was, was based entirely on *who* he knew that defendant was, not on anything defendant did *or* said.[7] The state argues that the circumstances were such as to permit Larson to act under ORS 131.625, which permits the frisking of "a stopped person for dangerous or deadly weapons if the officer reasonably suspects that the person is armed and presently dangerous to the officer or other person present."

---

"THE COURT: You indicated a knife on him before.

"THE WITNESS: No, I have never taken a weapon from Mr. Wales.

"THE COURT: If I had been driving a car, would you have patted me down?

"THE WITNESS: If you didn't have a driver's license, I would have and you didn't give me any I.D.

"THE COURT: You would have patted me down?

"THE WITNESS: And didn't know, yes, I would have patted down to try to find out who you were.

"THE COURT: Just to find out who I was you would pat me down?

"THE WITNESS: Yes, you may have I.D. on you. People lie that is why I do it.

"THE COURT: Okay."

[7] "Q [DEFENSE ATTORNEY]: The knives were legal?

"A [THE WITNESS]: As far as I know they were.

"Q And this night the knives he had were legal?

"A They sure were.

"Q As a matter of fact you gave them back to him; didn't you?

"A I believe, yes, I did at — either gave back to him or put them in his car.

"Q When you patted you could feel they were legal knives, too; couldn't you?

"A Yes.

"Q But you still went through his pockets and searched; didn't you?

"A Because at that point I didn't know what else. I wanted the knife off him.

"Q So you were just on a fishing expedition through his pockets; that correct?

"A No, I was going to take all his weapons off.

"Q You pat-down?

"A Yes.

"Q You felt they are legal.

"A I felt the pocket knives in the pockets, yes.

"Q And you knew they were legal and you still ----

"A I knew they were pocket knives.

"Q And you still went through the pocket searching?

"A I removed those knives from his pockets.

"Q Now, when you went through the first pocket you found the knife that you

*State v. Bates,* 304 Or 519, 747 P2d 991 (1987), was decided while this case was pending in this court. In that case, the state relied on *former* ORS 484.353(2)(b), which was in effect at the time of the stop:

"(2) A police officer:

" * * * * *

"(b) May stop and detain a person for a traffic infraction for the purposes of investigation reasonably related to the traffic infraction, identification and issuance of citation."

The Supreme Court noted that the activity which followed the traffic infraction stop there was not authorized by that statute. The state did not contend otherwise, unlike in this case. *Bates* turned on whether the officer reasonably suspected that the defendant was armed and dangerous and was, therefore, entitled to take reasonable steps to protect himself and a fellow officer.

After briefly discussing *Michigan v. Long,* 463 US 1032, 103 S Ct 3469, 77 L Ed 2d 1201 (1983), and *State v. Riley,* 240 Or 521, 402 P2d 741 (1965), the court held

"that Article I, section 9, * * * does not forbid an officer to take reasonable steps to protect himself or others if, during

---

knew was there and you had felt and the gold box; correct?

"A That's it. I believe gold-colored box.

"Q Gold-colored; do you know what material it's made?

"A It's made out of metal. I don't know what kind.

"Q You didn't have a fear that metal box could cause you some harm?

"A No fear at all.

"Q And when you felt the other pocket, you felt two knives; is that correct?

"A Correct.

"Q And that is when you had some fear some harm could come to you?

"A No, no I had — the fear occurred when I saw who it was, not necessarily fear, but concern would be a correct term.

"Q Concern. So what you are trying to tell the Court that you were in reasonable fear of your safety?

"A At that point I was concerned for my safety.

"Q Even though you had stopped him a couple times before and nothing had happened?

"A I hadn't stopped him, I had talked ----

"Q — talked to him?

"A Talked to him a couple times before."

the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present. * * * [I]t is not our function to uncharitably [sic] second-guess an officer's judgment. * * * An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made." 304 Or at 524.

The court went on to examine the facts under which the defendant was subjected to the search. The "underlying question" was: "Did any of the circumstances confronted by the officer either individually or collectively justify a reasonable suspicion that the defendant posed *an immediate threat* to [either of the officers] or both?" 304 Or at 525. (Emphasis supplied.) The court concluded:

"In summary, none of the * * * circumstances either individually or collectively justified a suspicion on [the officer's] part that this defendant posed an immediate threat. * * *

" * * * * *

"* * * Although the police are entitled to some leeway in taking protective measures, we must draw the line at some point. The facts articulated * * * in this case fall short of creating a reasonable belief that this defendant posed an immediate threat. In [the] light of defendant's cooperative attitude, his lack of aggressive or threatening behavior and the absence of any apparent weapon, the mere possibility that he might have committed a crime and the presence of what appeared to be a bag are not sufficient. The officers violated defendant's constitutional rights when they instructed him to slide the bag into view. * * *" 304 Or at 526.

Unlike in *State v. Bates, supra,* 304 Or at 528, the trial judge here did demonstrate on the record "what the judge perceived to be the crucial facts and decisive rationale":

"THE COURT: [Officer Larson] [s]topped this man, found he didn't have a license, going to hand him a citation. At that point in time is that officer in any way threatened that he had to be concerned about his own well-being?

"[PROSECUTOR]: That's certainly the ultimate question, and I think this officer's testimony that he had reasonable fear based on his experience and based on what he knew

of common experiences of law enforcement officers across the nation, certainly have a reasonable fear that a person who is armed and presently dangerous.

"* * * * *

"THE COURT: Don't misunderstand[.] I know the police officers are in the open [and that] that represents some hazard, so do you, so do I. We don't frisk everybody we come in contact with. We don't have everybody arrested.

"The question seems inescapable[.] [T]he officer indicated that he would have patted me down if I had been the person in this car. I have seen too many people stopped, been stopped myself and I know this doesn't occur. *Except I think he perceived Mr. Wales may have had some drugs on him because he knew him to be a person who dealt in methamphetamines. I think that is the reason we have the search. I don't think a reasonable search.*

"* * * * *

"[PROSECUTOR]: Is the Court's finding that the affirmative answer [to the question about weapons] was not sufficient to rise to the level of reasonable fear that [the] person was armed and dangerous?

"THE COURT: I think that patting this man down to search him under the circumstances of this, even recognizing it was four o'clock in the morning was not reasonable." (Emphasis supplied.)

In short, the trial court found as a fact that the reason for the pat down and search was *not* that Larson feared for his own or others' safety. That finding is supported by the record, whether or not a different finding would also have been supported, and we are bound by it. *Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968); *State v. Bridewell,* 87 Or App 316, 322, 742 P2d 648, *rev allowed* 304 Or 547 (1987). Therefore, *State v. Bates, supra,* cannot sustain the search here.

Affirmed.

**DEITS, J.,** dissenting.

I dissent from the majority opinion, because I disagree with the fundamental premise that we are bound by the trial court's supposed finding that Larson did not have concerns for his safety that would justify the frisk of defendant. The trial court did not find that Larson did or did not have

concerns for his safety. Rather, a reading of the trial court's entire discussion of the "reasonableness" of Larson's conduct indicates that the trial court found that Larson's motivation to search defendant because he was a known drug user overrode any safety concerns he might have had. Despite the trial court's belief that Larson's subjective motivations were improper, the proper question on review is whether the concerns articulated by Larson were sufficient to warrant the protective search. The fact that the trial court, in weighing the reasonableness of Larson's safety concern, considered Larson's motive to search defendant as being simply because he was a known drug user is not dispositive.

As the majority acknowledges, Larson had made a lawful traffic stop when, in his presence, defendant committed the crime of failing to carry or present a license to a police officer, which is a Class C misdemeanor. ORS 807.570; ORS 161.155; ORS 131.605(1). Larson knew that defendant was both a dealer and a user of methamphetamines, he had experience with the paranoria of such users and he knew that defendant had recently been in possession of a large number of weapons. Based on that knowledge, he was suspicious that defendant posed an immediate threat to his safety. He requested defendant to get out of the car and asked if he had any weapons. Defendant replied that he had "some knives" on him. Larson then frisked defendant. The Supreme Court's recent decision in *State v. Bates,* 304 Or 519, 747 P2d 991 (1987), governs the propriety of Larson's conduct. The Supreme Court held in *Bates,* without reliance on the "stop and frisk" statutes, that an officer may take reasonable steps to protect his safety if, during a lawful encounter, he reasonably suspects, based on specific and articulable facts, that his safety is immediately threatened. *State v. Bates, supra.*

*Bates* involves the identical issue here and similar facts. The defendant was stopped for excessive vehicle emissions, a class D traffic infraction. He did not contend that the stop was unlawful. The arresting police officer took a bag from the vehicle, searched it and found illegal drugs. The court began its analysis by quoting *former* ORS 484.353(2)(b), which is not markedly different from the statute applicable in this case, ORS 807.570(4), and concluding that the officer exceeded his authority under that statute by removing and searching the bag, because investigation of the bag was not

reasonably related to the traffic infraction for which he was stopped.

The state appeared to concede that point but argued that, once the defendant was validly stopped, the officer could take reasonable steps to protect himself. In response to that argument, the Supreme Court appeared to agree as a matter of law but ruled against the state as a matter of fact. The court held, based somewhat on *Michigan v. Long,* 463 US 1032, 103 S Ct 3469, 77 L Ed 2d 1201 (1983), and more precisely on *State v. Riley,* 240 Or 521, 402 P2d 741 (1965), that

> "Article I, section 9, of the Oregon Constitution does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." 304 Or at 524.

The court then proceeded to assess "charitably" the circumstances that faced the officer and concluded that none of the circumstances, individually or collectively, justified the officer's suspicion. The analysis in *Bates* makes it clear that the purpose of the lawful encounter is only tangentially material to the question of whether the officer may do something reasonably necessary to protect himself. The focus of the court's inquiry should be whether the encounter was lawful and whether the attending circumstances satisfied the *Bates* criteria for a protective search.

In *Bates,* the court recognized that an officer must be afforded considerable latitude in taking safety precautions but held that the officer's actions in that case were not reasonable, because none of the circumstances justified a suspicion that *the defendant* posed an immediate threat.[1] Here, the officer did have specific articulable concerns about defendant. Having lawfully stopped him, and, based on his knowledge of defendant's previous drug history and association with weapons, Larson's inquiry of defendant as to whether or not he was armed was a minimally intrusive and reasonable protective

---

[1] *See State v. Hicks,* 89 Or App 540, 749 P2d 1221 (1988). In this case, the court found the officer's actions unreasonable because the only circumstance he relied on was his generalized concern for his safety when he conducts traffic stops at night, rather than any specific, articulable facts regarding the person he had stopped.

measure. In the light of the circumstances, defendant's acknowledgment that he was armed justified Larson's protective search.[2] Larson was justified in taking the precautionary measures that he did.[3]

The next issue concerns the scope of the frisk. Although the majority does not address this issue, because I would hold that Larson's protective search of defendant was reasonable, I will address it. Again, pursuant to the Supreme Court's holding in *State v. Bates, supra,* the appropriate inquiry is what, assuming a reasonable suspicion of danger, an officer may do in response.[4] A pat-down frisk is a reasonable response. When the officer felt the knife in defendant's pocket, he was entitled to remove it to neutralize the perceived threat of harm. He removed the other object, a flat metal box, at the same time. That is not an unreasonable action. Otherwise, the officer would have had either to have highly developed tactile senses or to probe around in defendant's pocket to satisfy himself that there was no dangerous instrumentality. Whatever privacy enclave defendant possessed in his pant's pocket had already been legitimately breached by the officer's act of frisking for weapons and removing the knife. I do not think that the officer violated defendant's constitutional or statutory rights in removing the small box from his pocket.

---

[2] The fact that it was ultimately determined that the knives were legal is not dispositive. They still represented an immediate threat.

[3] Larson's explanation to the trial court of his general operating procedures may have been overzealous. However, how he may have acted under other circumstances is not directly relevant to this case. As explained in *State v. Bates, supra,* our review of an officer's action should be directed to the particular circumstances of the case.

"[I]t is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life or death decisions in a matter of seconds. There may be little or no time to weigh the magnitude of a potential safety risk against the intrusions of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry, therefore, is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time the decision was made." 304 Or at 524.

[4] Even if ORS 131.625 governs the frisk, Larson's action did not exceed the permissible scope of a frisk under that statute. He testified that, before reaching into defendant's right front pocket, he had felt the knife. He reached into the pocket and, while removing the knife, also removed the box. He did *not* say that he had felt the box before reaching into the pocket. He merely indicated that, after he had removed the box from the pocket, he realized that it was not a weapon. When an officer identifies an object which he reasonably suspects is a dangerous weapon, we do not read ORS 131.625 as requiring an officer to conclusively identify every other item in defendant's pockets before removing the contents of a pocket.

The next issue is whether it was lawful to open, that is "search," the box without a warrant. The probable cause needed to justify a search in this situation is the same as the probable cause needed to justify an arrest. *State v. Flores,* 68 Or App 617, 635 P2d 999, *rev den* 298 Or 151 (1984). By detaining defendant during the search of the box, Larson effectively arrested him, even though he was not physically restrained, transported to the police station or booked. *State v. Gordon,* 71 Or App 321, 325, 692 P2d 618 (1984), *rev den* 298 Or 705 (1985); *State v. Flores, supra; see State v. Caraher,* 293 Or 741, 653 P2d 942 (1982); *State v. Groda,* 285 Or 321, 591 P2d 1354 (1979). The issue then is whether Larson had probable cause to arrest defendant.

Larson testified that he knew that defendant had a background as a narcotics user. That information is relevant in determining probable cause. *State v. Diaz,* 29 Or App 523, 564 P2d 1066 (1977); *State v. Shotwell, supra.* He had also already discovered marijuana in defendant's possession. "Although possession of less than one ounce of marijuana does not itself create probable cause to search for more, it is still relevant in determining whether probable cause exists." *State v. Tallman,* 76 Or App 715, 721, 712 P2d 116 (1985). Finally, Larson recognized the box as a type of container that is likely to contain contraband. *See State v. Diaz, supra.* He testified that, on the basis of his knowledge of defendant as a drug user, the type of container and the finding of marijuana, he believed that the box was likely to contain additional contraband. That belief is objectively reasonable. *State v. Owens,* 302 Or 196, 729 P2d 524 (1986). Larson had probable cause to believe that the box contained contraband, and he lawfully arrested defendant for possession of its contents.

The final issue is whether the search by opening the box was validly incident to arrest. *See State v. Caraher,* 293 Or 741, 653 P2d 942 (1982). In order for a search incident to arrest to be valid, it must be both related to the crime for which the defendant was arrested and reasonable in time, scope and intensity. *State v. Caraher, supra; State v. Chinn,* 231 Or 259, 373 P2d 392 (1962); *State v. Flores, supra.* The search was related to the crime for which there was probable cause to arrest, possession of controlled substances. It occurred contemporaneously with the arrest and was

restricted to the object giving rise to probable cause to arrest, the gold-colored box. The search was lawful.

I would reverse and remand. Richardson, Van Hoomissen and Rossman, JJ., join in this dissenting opinion.