Argued and submitted February 8, reversed and remanded June 22, 1983

STATE OF OREGON,
*Respondent,*

*v.*

JAMES CRAIG FLEMING,
*Appellant.*

STATE OF OREGON,
*Respondent,*

*v.*

JAMES CRAIG FLEMING,
*Appellant.*

(Cases Consolidated)
(28577, 28580; CA A23974, CA A23975)

665 P2d 1235

John Daugirda, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were

Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

NEWMAN, J.

## NEWMAN, J.

Defendant appeals two convictions for burglary in the first degree.[1] He assigns error to the denial in consolidated proceedings of his motion to suppress evidence obtained from the search of his automobile and statements that he made to the police following his arrest. We reverse and remand for new trials.

The burglary of the Harrington residence on Cascade Drive in Bend was discovered just after 9 p.m. on November 16, 1980. The Harringtons saw two people leaving the vicinity in a Mazda and took the license number. The police determined that the Mazda belonged to a William Fleming of Astoria. They also noticed triangular grid footprints outside the residence characteristic of a Brooks running shoe.

Just after midnight the same night, Police Officer Stenkamp saw a Toyota with two passengers drive past the Harrington residence twice. Stenkamp stopped that car. The driver, William Fleming, produced his operator's license with an Astoria address. He told Stenkamp that he had moved to Bend from Astoria and was showing the passenger, his brother from Alaska, investment property in Bend. From the license number of the Toyota, police learned that William Fleming lived at 56 S.E. McKinley Street in Bend.

Later that morning the police observed the Mazda and the Toyota parked on the street by 56 S.E. McKinley Street. Officer Wauk watched the premises, while other officers applied for a warrant to search the property. Two other officers, Murphy and Reeves, stationed themselves in police cars nearby to cover Wauk. At about 8:50 a.m., Wauk saw defendant leave the McKinley Street address, take something out of either the Mazda or the Toyota, enter an AMC Eagle and drive away. The car had no license plates. Wauk radioed this information to Murphy and Reeves, who followed the Eagle in their police cars and stopped it. It came to a halt in a no-parking zone. Murphy got out of his police car and approached defendant's car from the rear. He then saw a 12-inch by 10-inch Alaska temporary registration plainly visible

---

[1] Defendant was convicted of both burglaries after consolidated stipulated facts trials. The burglaries were of the Harrington and Austin residences in Bend on November 16, 1980.

on the rear window of the car. A temporary registration sticker was also on the left front windshield of the car, but he did not see it. Reeves joined him.

Murphy asked defendant for identification. Defendant showed Murphy his Alaska operator's license and vehicle ownership papers. A computer check showed that defendant's Oregon driver's license was suspended. Murphy arrested him for driving while suspended.

Because the car was parked in a no-parking zone, Murphy told defendant that he could permit an officer to move the car and lawfully park it, he could permit an officer to drive it to the police impoundment lot or the car would be towed to the police station at defendant's expense. Defendant gave officer Reeves permission to drive the car around the corner and park it in a lawful place on the street. Reeves also asked defendant for permission to search the car, but he refused.

Reeves entered the car on the driver's side. At that time defendant was sitting in one of the nearby police cars, under arrest and handcuffed. Before Reeves entered the car, Murphy had observed a binocular case in the car that resembled a binocular case taken from his aunt in a burglary one week earlier. He also observed that defendant was wearing Brooks running shoes.

Reeves saw that the back seat was folded down but that sticking out from under the fold was what looked like clothing or backpack material. Reeves reached over and lifted the back of the seat "to get a closer look" and saw an automatic weapon, two flashlights and an overnight bag on the seat. Reeves folded down the back of the seat again and got out of the car. At that point he decided to impound the car. Reeves again asked defendant for permission to search the car, and he again refused. Reeves asked if defendant would permit him to drive the car to the police station. Defendant agreed.

Reeves did not conduct an inventory search at the police lot but seized the gun there. He ran a check on the serial number, which indicated that it was taken in the burglary of the Harrington residence the night before. Subsequently, jewelry, coins and another gun were found in the car and identified as articles stolen in the two burglaries. The record does not

show that those items were seized pursuant to a search warrant.

At 9:25 a.m., defendant was booked for driving while suspended, carrying a concealed weapon and burglary and was placed in a holding cell. At 11:34 a.m., Detective Shortreed advised defendant of his *Miranda* rights. Defendant signed a written waiver form, and Shortreed questioned him. Defendant said he wanted to talk to his brother first. He made a phone call to his brother. After the phone call, Shortreed interrogated him about the gun, and defendant told him that "it had been found under a pile of brush in the woods." Shortreed asked if the police could search defendant's car, and defendant again refused.

Defendant moved to suppress all evidence obtained as a result of the search of the Eagle and joined in William Fleming's motion in the state's prosecution of him for burglary to suppress all testimony and evidence relating to Stenkamp's stop of the Toyota. Defendant argued that (1) the stop of the Eagle was the "poisonous fruit" of the earlier "illegal" stop of the Toyota, (2) there was no independent basis for the stop of the Eagle because it rested neither on reasonable suspicion nor on an observation of a traffic infraction and (3) the search of the Eagle, the observations then made, the items seized from the car and defendant's statements at the police station were the "poisonous fruits" of the warrantless search of the Eagle on the street and of the Toyota the previous night.

The trial court denied defendant's motion to suppress, finding:

"1. Murphy stopped the vehicle because he did not observe any license plate on the vehicle;

"2. Upon arresting the defendant, Officer Reeves was given permission to move the vehicle from its precariously located position to one where it could be lawfully parked. The observations then made and the subsequent impoundment and search was permissible as an inventory search of the contents of the vehicle."

On the same date the trial court in the companion case against William Fleming suppressed the evidence seized from a search of the McKinley Street property pursuant to a search warrant. The court found that the validity of that

search rested on the connection of William Fleming to the McKinley Street address:

> "The defendant's address of 56 S. E. McKinley was obtained following a license record check of a 'black or gray' Toyata Celica vehicle that had been stopped in the West Hills of Bend shortly after midnight by Officer Stenkamp. Approximately three hours earlier the observations and activities of an orange Mazda vehicle did reasonably cause a license check to be made of the Mazda that produced this defendant's name with an Astoria address.

> "* * * The stop by Officer Stenkamp was an unlawful stop because he had *no* suspicion that the occupants of the Toyota had committed a crime, much less a reasonable suspicion. He did speculate that they were 'casing' the neighborhood and coupled with his statement that he would have stopped any vehicle in the neighborhood at that hour, the stop was nothing more than a proscribed random stop.

> "There is no evidence before the Court that the McKinley Street address came from any other source but from the unlawful Stenkamp stop of the Toyota. Assuming the officers located the orange Mazda parked next to 56 S.E. McKinley, independently from any license check of the Toyota, such locating of the suspect vehicle would not connect that vehicle with the interior of that residence nor provide any probable cause for its search." (Emphasis in original.)

The trial court found, in the instant case, that Murphy stopped the Eagle because he did not observe any license plate on the vehicle.

 Defendant argues that, but for the illegal stop of the Toyota, the police would not have watched the McKinley Street address would not have observed defendant's Eagle and therefore would not have stopped it. Even if the police would not have watched the McKinley Street address or have followed defendant's Eagle but for the illegal Toyota stop, the court nonetheless found that Murphy stopped defendant's car because he did not observe any license plate on the vehicle. The evidence supports that finding. We will not disturb the trial court's finding of historical facts. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968). There was, therefore, an independent reason for Murphy to stop defendant's vehicle. The stop of the Eagle was not the result of the illegal Toyota stop.

■ Defendant also argues that the stop of the Eagle rested neither on reasonable suspicion nor on an observation of an illegal traffic infraction. We disagree. The trial court found that Murphy stopped defendant's vehicle because he did not observe any license plate on the vehicle. *See State v. Carter/Dawson,* 287 Or 479, 485, 600 P2d 873 (1979); *State v. Tucker,* 286 Or 485, 490-95, 595 P2d 1364 (1979). When Murphy did not observe a license plate, he had probable cause to believe that defendant had committed a traffic infraction. Former ORS 481.230(5), (6); ORS 484.350(4).[2] Murphy could stop defendant to serve a citation for the observed violation. *State v. Brister,* 34 Or App 575, 579 P2d 863, *rev den* 284 Or 521 (1978). Having made a lawful stop, Murphy could ask defendant to show his operator's license and vehicle registration, even though by that time Murphy had seen the Alaska temporary certificate on the window. Former ORS 482.040(2)(b).[3] Defendant does not challenge Murphy's right to ask him to display his license but argues only that there was no valid basis for the stop. *See State v. Watson,* 43 Or App 309, 602 P2d 1098 (1979). The stop of defendant was valid.

Defendant argues that when Reeves entered the car and lifted the folded-down back seat he was conducting a warrantless exploratory search for evidence contrary to the Fourth Amendment and Article 1, section 9 of the Oregon Constitution. We are not bound by the trial court's finding that Reeves' search of defendant's car was "permissible as an inventory search of the contents of the vehicle," because that involves a determination whether state and federal constitutional standards have been exceeded. *Ball v. Gladden, supra.*

The state does not argue that Reeves had probable cause to search defendant's car,[4] but it does assert that the warrantless search was reasonable "as part of a cursory inventory of the contents of the car, made prior to [Reeves'] exercising dominion over it." At the suppression hearing Reeves did not testify that any actual department procedure provided for such a "cursory inventory" but stated that

---

[2] *Amended by* Or Laws 1981, ch 818, § 31, *renumbered* ORS 153.505.

[3] *Amended by* Or Laws 1981, ch 818, § 4.

[4] *United States v. Ross,* 456 US 798, 102 S Ct 2157, 72 L Ed 2d 572 (1982), is inapplicable in the absence of probable cause and exigent circumstances.

"* * * it would be my own personal procedure to look in the interior of the vehicle and note whatever property might be within prior to entering it or moving the vehicle."

■ Except for a few exceptions, warrantless searches are *per se* unreasonable. *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967); *State v. Greene,* 285 Or 337, 591 P2d 1362 (1979). After a vehicle has been lawfully impounded, a warrantless inventory search of articles in plain view in the vehicle has been sustained. *State v. Keller,* 265 Or 622, 510 P2d 568 (1973); *State v. Thirdgill,* 46 Or App 595, 613 P2d 44 (1980). The purpose of such a procedure is to protect the vehicle and the property in it and to safeguard the police from danger and from claims for lost possessions. But defendant's vehicle was not impounded at the time of Reeves' search.

■ Reeves also could not, without a search warrant or defendant's consent, lift the folded-down back seat as part of a "community caretaking" function under which the police may take into custody vehicles that are illegally parked, impede traffic or threaten public safety or convenience. *State v. Thirdgill, supra.* Whatever may be the authority of the police to "inventory" the contents of a vehicle as part of their community caretaking functions, they could not, without a warrant, search the vehicle for items not in plain view.

In *State v. Childers,* 13 Or App 622, 511 P2d 447 *rev den* (1973), 18 Or App 564, 526 P2d 446, *rev den* (1974), an officer saw the defendant's car drive down a boat ramp in a park to within 10 feet of the river and then stop. He asked the defendant for his driver's license. When the window was rolled down, the officer thought he could smell an odor of marijuana. He felt that he needed assistance, however, and allowed the defendant to leave. As the defendant's car entered the highway, the officer saw that it did not have a light over its rear license plate and stopped the car again. He and another officer conducted an "equipment check" of the vehicle, found that it had an inadequate handbrake and arrested the defendant for not having any registration and for the handbrake. Because the defendant was under arrest and his passenger was only age 14, the officers called a towing company to remove the car. Before the car was towed, an officer conducted an "inventory search" and found drugs under a sleeping bag on the back seat. The trial court twice found that the search was a valid

inventory search, intended only to secure the defendant's property. The officer testified at the first trial:

> " 'Well, as I was going into the back portion of the station wagon there it was laid out into a bed fashion. In other words, the back seat was down. There was [sic] two sleeping bags. As I lifted one sleeping bag I found a plastic bag * * *.' " 13 Or App at 628. (Emphasis deleted.)

At the retrial he testified:.

> " 'I merely reached over the back of the front seat and picked up the end of the sleeping bag on that end and folded it back to see if there was anything underneath of value, folded it back towards the rear of the station wagon.' " 18 Or App at 565-66.

Twice we reversed and held that the evidence should be suppressed, because the drugs were not in plain view. The search was a

> "* * * 'probing' upon mere suspicion * * *. A reading of the entire record at bar * * * indicates that was the real reason for the search. Searches without a warrant are prima facie unreasonable." 18 Or App at 568.

*See also State v. Keller, supra.*

Here it was reasonable for the police to secure defendant's car and its contents by parking it in a legal zone around the corner and locking the doors. Reeves, however, had no right to search beyond a plain view. He was not acting either for defendant's benefit or to protect the police when he lifted the folded-down seat. Had the officer been concerned about leaving defendant's personal valuables in the car, he could have asked defendant about arrangements he wished to make before moving the car. *See* LaFave, *Search and Seizure,* § 7.4 (1978). There is no evidence that the car windows would not close or that the car was incapable of being locked as in *United States v. Scott,* 665 F2d 874 (9th Cir 1981). If the police wanted to protect the vehicle's contents, all they had to do was roll up the windows and lock it. *State v. Childers, supra,* 18 Or App at 568. The record indicates also that the car probably would remain on the street only a short time. Defendant's bail was $165, an amount he had on his person.

■ The scope of the search was also limited by defendant's consent. After refusing to give the officers consent to search his vehicle, defendant was asked whether he wanted his car driven or towed to the police station or whether he wanted it moved a few feet and lawfully parked. Defendant chose the latter alternative. He gave Reeves consent to enter his car for the limited purpose of moving it and parking it around the corner. Once in the car, Reeves could observe and seize contraband or weapons in plain view. *State v. Keller, supra; State v. Childers, supra.* The weapon, however, was not in plain view, but under the folded-down back seat. Defendant did not give Reeves permission to lift the seat.

There is no claim or testimony that the police needed to search the car to protect themselves from claims or from danger.[5] At no time did Reeves systematically inventory the car and document the items he found to protect the police against claims. Instead, he randomly probed through the car, acting on a hunch that he would discover evidence of the burglaries. Reeves did not need to search the passenger compartment of the car to protect himself and others against potential danger. Defendant, under arrest for driving while suspended, was, at the time Reeves entered the car, handcuffed in the back seat of a nearby police car and posed no threat to the safety of anyone.[6]

The state did not carry its burden of proving that Reeves' warrantless search of defendant's car, when it was stopped in the no-parking zone, was valid. US Const, Amend IV; Or Const, Art I, § 9. Testimony as to Reeves observations of what was under the back seat should have been suppressed.

■ The trial court found that the "subsequent impoundment and search" were justified as an inventory search. We assume that the court's finding was intended to justify the warrantless seizure from defendant's vehicle of the gun, coins and jewelry taken from the Harrington residence and the gun and coins taken from the Austin residence after it was impounded

---

[5] We need not and do not decide the application of *New York v. Belton,* 453 US 454, 101 S Ct 2860, 69 L Ed 2d 768 (1981), to the facts presented. The state has not asserted that the search of the interior compartment of defendant's vehicle was incidental to a valid arrest.

[6] *Compare State v. Goodman,* 63 Or App 102, 663 P2d 422 (1983), where defendant was reasonably suspected of carrying a gun.

and located at the police station. We find those seizures, however, unlawful as the fruit of the previous illegality. Indeed, there is no evidence the police ever obtained a search warrant or tried to make an actual inventory of the items in the car. Defendant's consent to the removal of his car to the police station after Reeves had lifted the back seat and observed the gun does not cure the illegality. The items seized should have been suppressed. *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963); *State v. Kennedy,* 290 Or 493, 624 P2d 99 (1981).[7]

Reversed and remanded for new trials.

---

[7] Defendant's statements to Shortreed at the police station are not suppressed. Defendant raises for the first time on appeal that the police violated his right to remain silent when Shortreed questioned him after he had telephoned his brother. Defendant asserts that Shortreed resumed interrogation "without further advice of rights nor a valid waiver." Defendant did not preserve that error, if any, in the trial court, and we do not consider it. Defendant's statements, furthermore, were sufficiently an act of free will to purge the taint of the preceding illegal search, particularly because defendant, after receiving *Miranda* warnings and before the interrogation, spoke to William Fleming on the telephone. In that conversation, defendant reminded his brother that the two of them had found a gun under some brush while wood-cutting the day before. We also note that Shortreed had listened to the telephone conversation which defendant had with his brother. Defendant does not challenge Shortreed's right to listen to the telephone conversation. Shortreed, therefore, had already learned from defendant the substance of the information which defendant then told him in response to the interrogation.