Argued and submitted March 2, decision of the Court of Appeals reversed, decision of
trial court affirmed and remanded to trial court July 26, 1988

STATE OF OREGON,
*Respondent on Review,*

*v.*

JON BRIDEWELL,
*Petitioner on Review.*

(TC No. 1233; CA A38352; SC S34603)

759 P2d 1054

John R. Faust, Jr., Portland, argued the cause for petitioner on review. With him on the petition for review and memorandum in response to questions by the court was Schwabe, Williamson & Wyatt, Portland.

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for respondent on review. On the memorandum in response to questions by the court were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

CARSON, J.

Peterson, Chief Justice, concurred in part and dissented in part in an opinion in which Jones and Gillette, Justices, joined.

## CARSON, J.

For allegedly cultivating marijuana upon his premises, defendant was accused by criminal information with Manufacture of a Controlled Substance.[1] Evidence of the crime was gathered when deputy sheriffs entered defendant's premises to investigate his possible disappearance. Defendant contends that their entry was unlawful, and he moved the trial court, *inter alia,* to suppress "the evidence * * * and * * * all information or knowledge gained either directly or indirectly as a result thereof * * * and all statements." In addressing defendant's motion at the suppression hearing, the trial court found the following facts:

Defendant lives alone in an isolated, rural area. Shortly before June 16, 1985, defendant's friend received several packages from United Parcel Service addressed to defendant. She tried to telephone defendant to come and pick them up. Although defendant's answering machine was working, defendant never returned the call.

After three or four days, the friend became concerned because she knew defendant worked as a logger on his premises, lived alone, and might have suffered an injury. She also knew that defendant suffered from headaches and that threats had been made upon his life. On June 16, she drove to defendant's premises between 8:00 and 9:00 p.m. When she arrived, she noticed that defendant's dogs were chained to the front porch, the front door was open, and defendant's two pickup trucks were gone.

The friend then went to the back door and entered the house. She called for defendant and noticed an empty pistol holster. The house was in a disheveled state. The friend tried to enter a bathroom but could not because the door was blocked by clothing.

Not finding defendant, the friend went to another building on defendant's premises. She focused her vehicle lights on the doors and again called for defendant. There was no response.

She then drove to the sheriff's office. She gave a

---

[1] ORS 475.992.

deputy a statement relating what she had observed. The deputy took the statement shortly before 10:00 p.m. No attempt was made to contact defendant from the sheriff's office.

The deputy decided that he would need a four-wheel drive to reach defendant's residence.[2] He arranged for this with another deputy, and the deputies decided to go to defendant's residence the following morning. Department custom was to inquire into this type of matter during daylight. The deputies also believed that the situation did not present an emergency.

Upon arriving at defendant's residence the following day, the deputies observed the dogs on the front porch. The front door was still open, and they walked into the house. The deputies observed the empty holster and the disarray of the house. Although they called for defendant and looked upstairs, they did not find defendant.

The deputies then walked to defendant's shop. The shop was on defendant's premises, about 125 yards from his residence. Both doors were open. From inside, the deputies heard a "swishing" noise. Without calling for defendant, they entered the shop and saw, through an open door to a separate part of the shop, four marijuana plants, baskets, and grow lights.

The deputies called for defendant, who emerged from the room in which the plants were seen. He shut the door behind him. The deputies asked defendant to open the door, but defendant replied that they needed a warrant. When the deputies responded that they did not need a warrant because they already had observed the evidence, defendant assented and opened the door. Three hundred fifty-four marijuana plants were seized. Although they discovered the alleged criminal activity, the trial court also found that the deputies did not go to defendant's premises to look for marijuana plants or evidence of "misdeeds."

On these facts, the trial court ordered the suppression

---

[2] The deputy apparently decided this despite evidence that a four-wheel drive was *not* required. Defendant's friend testified at the suppression hearing that she drove a regular pickup to defendant's property on the evening of June 16.

of evidence, finding that "there was no legal and valid intrusion into the shop."[3] The Court of Appeals reversed, concluding that, pursuant to their "community caretaking function," the deputies had a "reasonable basis" for entering defendant's premises. *State v. Bridewell,* 87 Or App 316, 742 P2d 648 (1987). We reverse the decision of the Court of Appeals.

## I. LEGALITY OF INTRUSION IN CRIMINAL CONTEXT

Absent consent, law enforcement officials must have a warrant to search a person's premises. Warrantless entries and searches of premises are *per se* unreasonable unless they fall within one of the few specifically established and carefully delineated exceptions to the warrant requirement. *State v. Davis,* 295 Or 227, 237, 666 P2d 802 (1983).

### A.  Emergency/Exigent Circumstances Exception.

In this case, the deputies did not have a warrant to enter defendant's premises. The question is whether the entry may be justified under an exception to the warrant requirement. This court has recognized the existence of an "emergency doctrine" exception to the warrant requirement in the context of investigation of crime. *State v. Miller,* 300 Or 203, 229, 709 P2d 225 (1985).

The trial court here concluded that there was no emergency and thus no justification for the warrantless entry. We are bound by the trial court's determination of what actually happened and limit our review to determining whether legal principles were correctly applied. *State v. Davis, supra,* 295 Or at 238.

Under the emergency/exigent circumstances exception, a warrantless entry requires probable cause. The deputies did not have probable cause to believe that defendant had been victimized by criminal activities upon his premises and was in need of their immediate assistance. They had not received a report of criminal activities or violence, merely that defendant's house was unkempt, his dogs unattended, and his

---

[3] The court also held that: (1) exigent circumstances did not exist to seize the plants; and (2) the deputies should have procured a warrant to search the room in which the plants were found.

vehicles absent from their usual location. Nor was the report of an empty pistol holder or defendant's failure to respond to his friend's telephone or verbal calls sufficient to give rise to probable cause to look for criminal activity. The deputies did not have anything from which to conclude, even assuming that defendant had been the victim of criminal activity, that he was to be found upon his premises. We conclude that the deputies lacked probable cause of criminal activity sufficient to justify warrantless entry upon defendant's premises under the emergency/exigent circumstances exception.

Further, even were we to conclude that the deputies did have probable cause to believe criminal activity was afoot, we note that the record does not disclose whether the deputies ever sought a warrant. Securing a warrant before entry is unnecessary if exigent circumstances, in addition to probable cause, exist, *i.e.,* if an "emergency" exists. By the time they drove to defendant's premises on the morning of June 17, about 12 hours had passed since the deputies had taken defendant's friend's statement. Although the passage of time does not necessarily negate an exigency, and an exigency may be created with the passage of time, it is also true that the passage of time detracts from a claim that an exigency existed. *See State v. Beede,* 119 NH 620, 406 A 2d 125, 131 (1979). Even if department custom might excuse an immediate, nighttime investigation, the deputies did not go to defendant's premises until later the following morning. The passage of the intervening hours significantly dissipated any possible exigency. The passage of substantial time also suggests that the deputies could have tried to secure a warrant in the interval between the friend's report and their entry onto defendant's premises.

### B. Emergency Aid Doctrine.

Apart from the emergency/exigent circumstances exception to the warrant requirement, this court tacitly has embraced the emergency aid doctrine in a criminal context. *See State v. Davis, supra.* The emergency aid doctrine is distinct from the emergency/exigent circumstances exception to the warrant requirement because the former does not require probable cause to believe that a crime has been committed. In *Davis,* the trial court concluded that the police did not have probable cause to enter when investigating a disturbance in a

motel room. In reviewing that case, we observed the recognition of the emergency aid doctrine in both federal and state courts. We also observed that "this court has not had occasion to apply" the emergency aid doctrine. *State v. Davis, supra,* 295 Or at 238. After concluding that the circumstances in *Davis* arguably fell within the scope of the emergency aid doctrine, we held that any "emergency" previously existing had dissipated when the purported victim left the motel room.

■　　However, even where courts may accept a reasonable belief or suspicion, as opposed to probable cause, as a basis to apply the emergency aid doctrine to law enforcement activities, this means a true emergency. As noted above, the facts of this case do not meet that threshold requirement.

## II. LEGALITY OF INTRUSION IN OTHER THAN A CRIMINAL CONTEXT

We recognize that an "emergency doctrine," of one sort or another, has been applied to warrantless searches and seizures in which probable cause and exigent circumstances exist without reference to criminal activity or situations likely to involve criminal activity.[4] We never have expressly held that emergencies solely justify warrantless entries in a criminal context, and we decline to do so here.

It is apparent, however, that an "emergency doctrine," as an exception to the warrant requirement, is most useful in the criminal law context where the issue of warrantless entries most often arises. Moreover, as is demonstrated by Part I.A of this opinion, the doctrine is best utilized as the "emergency/exigent circumstances exception." 306 Or at 235-36. Probable cause has been a traditional criminal law construct. *See South Dakota v. Opperman,* 428 US 364, 370 n 5, 96 S Ct 3092, 49 L Ed 2d 1000 (1976) (probable cause

---

[4] *See State v. Beede,* 119 NH 620, 406 A 2d 125 (1979). *Cf. United States v. Presler,* 610 F 2d 1206 (4th Cir 1979) (warrantless entry of apartment upheld where landlady observed unusual odor and requested that police investigate); *State v. Plant,* 28 Or App 771, 561 P2d 647 (1977) (warrantless entry upheld where maid found defendant lying unconscious and police were summoned); *Ash v. State,* 424 So 2d 1381 (Ala Crim App 1982) (noncriminal search of premises without warrant to look for missing child).

Also see *State v. Fisher,* 141 Ariz 227, 686 P2d 750, 763-64 (1984) for a discussion of the distinction between the "exigent circumstances exception" and the "emergency aid doctrine."

peculiarly related to criminal investigations, not routine, non-criminal procedures); *but see Camara v. Municipal Court,* 387 US 523, 87 S Ct 1727, 18 L Ed 2d 930 (1967) (probable cause required for housing inspection warrant) and n 6, *infra.* With this in mind, the Court of Appeals wrote: "On these facts, it makes no sense to speak of warrants or the warrant requirement. When they first went to defendant's property, the deputies did not have probable cause to seek a warrant to search for any purpose. Therefore, no search warrant could have issued." 87 Or App at 321. The Court of Appeals went on, however, to find that the deputies lawfully were upon defendant's premises pursuant to their "community caretaking function."

As the Court of Appeals observed, the concept of a community caretaking function was recognized in *Cady v. Dombrowski,* 413 US 433, 93 S Ct 2523, 37 L Ed 2d 706 (1973). The United States Supreme Court recognized that local law enforcement officials frequently investigate motor vehicle accidents and engage in "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 US at 441.

This phrase previously has been quoted in one of this court's decisions. In *State v. Atkinson,* 298 Or 1, 688 P2d 832 (1984), we observed that the First Circuit upheld an intrusion upon a boat where there was a reasonable fear of a drowning. The federal decision was based upon a combination of " 'community caretaking functions' " and "possibly exigent circumstances." 298 Or at 9 n 4. We also noted in *Atkinson* that a Florida appeals court upheld a police officer's entry into an automobile driver's pocketbook to look for medical disability identification under circumstances suggesting that the driver was undergoing a medical emergency. *Id.*

The Court of Appeals previously has dealt with the concept of a community caretaking function. In *State v. Apodaca,* 85 Or App 128, 735 P2d 1264 (1987), the court held that state troopers were not entitled, as part of their community caretaking functions, to enter a house without a warrant as part of an investigation into an automobile accident. In *State v. Fleming,* 63 Or App 661, 665 P2d 1235 (1983), the court held that police officers could not, pursuant to a community caretaking function, lift a folded-down back seat of an

automobile that they had stopped and moved at the defendant's request. *See also State v. Thirdgill,* 46 Or App 595, 613 P2d 44 (1980).

There is no generic "community caretaking function." Whether law enforcement officers have specific functions is a matter of statutory law. Whatever the existence, extent, or nature of community caretaking functions, however, mere exercise of any activity pursuant to one of them does not insure compliance with Article I, section 9. Any intrusion of state power upon a constitutionally protected interest, be it for civil or criminal investigative purposes, must comply with constitutional standards. The Court of Appeals decided that the intrusion in this case complied with the constitutional standard of "reasonableness" and so upheld the deputies' entry upon defendant's premises. 87 Or App at 324. We find it unnecessary to decide the issue because the deputies were without statutory or other authority from a politically accountable body to enter upon defendant's premises pursuant to a community caretaking function.

As the lead opinion stated in *Nelson v. Lane County,* 304 Or 97, 102 n 2, 743 P2d 692 (1987), "[w]e often have stressed the need to examine statutory authority and the limitations imposed by that authority before reaching any constitutional question." In this case, the state cannot point to a statute or ordinance authorizing entries by sheriffs or their deputies in response to citizen concern about the safety and well-being of neighbors. We conclude that the deputies were without authority to enter upon defendant's premises and that all evidence resulting from that unauthorized entry properly should be suppressed.

Contrary to the assertions in the concurring/dissenting opinion, however, our decision today does not mean that law enforcement officers may not enter upon a person's premises to render assistance to someone in need of that assistance. In situations implicating criminal law enforcement functions, law enforcement officers may enter without a warrant to render emergency assistance under the emergency/exigent circumstances exception to the warrant requirement. In situations not implicating criminal law enforcement functions and not justified by the emergency/exigent circumstances exception, law enforcement officers, like private

individuals, also may enter to render emergency assistance.[5] In the latter situation, however, incriminating evidence arising from the intrusion by law enforcement officers must be suppressed.[6]

The decision of the Court of Appeals is reversed. The decision of the trial court is affirmed and the case is remanded to the trial court for proceedings consistent with this opinion.

**PETERSON, C. J.,** concurring in part, dissenting in part.

On July 8, 1988, *The Oregonian* sports section contained this report:

"The badly decomposed body of Bret Michael Starr, 24, was found Thursday in a suburban Tampa, Fla., house leased by his father, former NFL quarterback and coach Bart Starr.

"Bart Starr summoned police after he arrived at his son's house Thursday morning, discovered a foul smell and couldn't get in, said Hillsborough, Fla., Capt. Gary Terry."[1]

---

[5] An entry by law enforcement officers to prevent serious harm to another would, in all likelihood, be privileged against a claim of trespass by the possessor of property. *See* Restatement (Second) of Torts, § 197. It also would not constitute criminal trespass. *See* ORS 164.205(3)(a), 164.245, 164.255, and 164.265; *State v. Walker,* 135 Or 680, 685-86, 296 P 850 (1931).

[6] Politically accountable bodies might provide statutory or other authority for exercising the type of community caretaker function here contemplated. They have done so in other areas in which government officers enter upon property for governmental purposes. *See* ORS 476.155 to 476.170 (fire inspection warrants) and ORS 654.202 to 654.216 (safety and health inspection warrants). Such authority might provide for exercising the community caretaker function in a manner that might comply with Article I, section 9. A warrant process might be established whereby law enforcement officers obtain a warrant to enter upon premises to seek missing persons or others reportedly in distress. Where exigent circumstances exist, the law might provide for warrantless entries, provided there is probable cause for the entry.

For background on probable cause and warrants outside the criminal context, *see Michigan v. Tyler,* 436 US 499, 98 S Ct 1942, 56 L Ed 2d 486 (1978); *Marshall v. Barlow's Inc.,* 436 US 307, 98 S Ct 1816, 56 L Ed 2d 305 (1978); *State v. Weist,* 302 Or 370, 730 P2d 26 (1986); *State v. Beede, supra.* For a general discussion of the issue of civil searches, see Note, *The Emergency Doctrine, Civil Search and Seizure, and the Fourth Amendment,* 43 Fordham L Rev 571 (1974/75).

Finally, we note that *State v. Walker, supra,* is disavowed to the extent that it purports to allow exercise of a community caretaker function without prior authority.

[1] The majority may quarrel with my extract from the newspaper, because the house was "leased" to Mr. Starr and therefore the entry likely was with the permission of the lessee of the house. The point that I seek to make, by using that example and others in this opinion, is that police should and do regularly respond to requests of friends and relatives and others for assistance when people are concerned about the health, safety or welfare of their friends, loved ones and others. That is what this case is about.

Such events (events involving police assistance to concerned persons) occur every day in the United States. The police receive many calls requesting assistance in non-criminal matters. My contention is that law enforcement officers such as sheriffs, city police and state police, in addition to their criminal law enforcement responsibilities, have authority to help others in need. In discharging these duties and responsibilities, it is sometimes necessary and proper to enter the property of others without a warrant. The Wallowa County sheriff's deputies' entry upon the defendant's property was pursuant to such duties and responsibilities and violated no constitutional right of the defendant.

## HISTORICAL BACKGROUND OF SEARCH AND SEIZURE CONSTITUTIONAL PROVISIONS

Alone among the guaranties adopted by the framers of the United States Constitution, the Fourth Amendment incorporated procedural safeguards against arbitrary government that had existed in both England and the colonies since the early 1760s. It is, of course, not possible to understand the Fourth Amendment without considering the long history of government abuse of warrantless searches and seizures in England. But it was the events of the 30 years prior to the Constitutional Convention of 1789 that excited a "strong sensibility" among Americans and led directly to the adoption of the Fourth Amendment. 3 Story, Commentaries on the Constitution 748 (1833); *see also Davis v. United States,* 328 US 582, 605, 66 S Ct 1256, 90 L Ed 1453 (1946) (Frankfurter, J., dissenting).

The legislative history of searches and seizures in England begins in 1335, when innkeepers in port towns were commanded to search guests for imported counterfeit money. In the fifteenth century the Crown granted certain guilds the right to send their officers to search the workshops of all persons in order to determine whether there were violations of guild regulations. Stengel, *The Background of the Fourth Amendment to the Constitution of the United States,* 3 U Rich L Rev 278, 283 (1969); Lasson, The History and Development of the Fourth Amendment 23 (1937 repr. 1970).

Search and seizure quickened during the Elizabethan and Stuart eras, when political and religious unrest provoked sharp, oppressive reaction by the Crown. Stengel, *supra* 3 U

Rich L Rev at 283; Lasson, *supra* at 24. Matters concerning printing, religion, seditious libel and treason became the subjects of uncompromising laws. Government officers were given unbridled discretionary power to search out persons and places, and to seize indiscriminately. Landynski, Search and Seizure and the Supreme Court 20-30 (1966). The primary instruments for ensuring political and religious conformity in the country were the Privy Council and the Courts of Star Chamber and High Commission. The first ordinance to license books and restrict printing was enacted in 1566, when the Court of Star Chamber authorized wardens of the Stationers' Company to open all packages and trunks of papers and books brought into the country whenever they suspected a violation of the ordinance. Lasson, *supra* at 24.

James I (r. 1603-25) uninhibitedly granted arbitrary powers to persecute nonconformists, to censure the press, and to regulate trade. It was during his reign that the writ of assistance, a general warrant commanding all officers and subjects to assist in the execution of the warrant, came into being. Lasson, *supra* at 28. The reign of Charles I (r. 1625-49), who preferred to rule by prerogative rather than by accommodation, was particularly noteworthy for its reliance on general searches for printed matter.[2] The Long Parliament, which assembled in 1640, reacted to his brand of despotism by abolishing the Courts of Star Chamber and High Commission, and ordering the punishment of those who had executed general warrants against members of Parliament. But even it was unable to resist the easy temptations of despotism, for with the monarchy in ruins, political writers targeted the Parliament. In retaliation, Parliament passed censorship and search laws similar to those enacted by the very king it deposed. Landynski, *supra* at 23.

During the Restoration era of Charles II (r. 1660-85), warrants routinely were issued to search for seditious literature in the trunks, cabinets and studies of political suspects. Stengel, *supra,* 3 U Rich L Rev at 284; Lasson, *supra* at 31. The Licensing Act, which was aimed at regulating the press,

---

[2] It was, in fact, during the reign of Charles I that the study and library of Sir Edward Coke, one of the common law's greatest jurists, was ransacked for manuscripts as he lay on his death bed. Bowe, The Lion and the Throne: The Life and Times of Sir Edward Coke, 1552-1634, p 533 (1957).

granted to officials a power to search as broad as any English government had enjoyed in the past. Lasson, *supra* at 37. Charles additionally used the device of general warrants to control customs, and he enacted the despised "hearth money" tax, empowering collectors to enter any house at any time during the day. *Id.*

A more thoughtful mood slowly began to develop in reaction to the indiscriminate use of these general warrants. William of Orange (r. 1689-1702), who ascended the throne as a result of the Revolution of 1688, condemned a tax law that exposed "every man's house to be entered into, and searched by persons unknown to him" as a "badge of slavery upon the whole people." Landynski, *supra* at 25.

It was not, however, until the mid-eighteenth century that the despotic use of general warrants finally was curtailed. In 1762, John Wilkes, a member of Parliament, began publishing a series of anonymous pamphlets, entitled The North Britain, which were highly critical of the government. A general warrant was issued, authorizing arrest of the printers and publishers and seizure of their papers. Over 40 persons were arrested. Some retaliated by suing the executing officers for trespass. These suits were heard before Charles Pratt, later Lord Camden, Lord Chief Justice of the Court of Common Pleas, whose views were more enlightened than those of the government he served. Camden allowed, over objection, the case to go to the jury and upheld heavy damage awards against the defendants. Taylor, Two Studies in Constitutional Interpretation 29-31 (1969).

Two cases tried before Lord Camden at this time had particularly enduring effects on the constitutional history of America, as well as that of England. The first, *Wilkes v. Wood,* 19 Howell's St Tr 1153 (1763), which grew out of the events described above, was, according to Edmund Randolph, the inspiration for the provision in the 1776 Virginia Declaration of Rights establishing as a fundamental right freedom from unreasonable searches and seizures. *See* Randolph, *Essay on the Revolutionary History of Virginia,* 44 Virginia Magazine of History and Biography 43-47 (1936), quoted in 1 Schwartz, The Bill of Rights, a Documentary History 248 (1971). Lord Camden did not doubt the illegality of these warrants, and in summing up the evidence he asserted:

> "The defendants claim the right, under precedence, to force person's houses, break open escrutores, seize their papers &c, upon a general warrant, where no inventory is made of things thus taken away, and where no offenders' names are specified in the warrant, and therefore a discretionary power given to messengers to search wherever their suspicions may chance to fall. If such a power is truly invested in a secretary of state, and he can delegate this power, it certainly may affect the person and property of every man in this kingdom, and is totally subversive of the liberty of the subject."

*Wilkes v. Wood, supra,* 19 Howell's St Tr at 1167.

In 1765 that case came before Chief Justice Lord Mansfield on the Court of King's Bench. While Lord Mansfield affirmed the decision on somewhat narrow grounds, he did declare that a warrant which failed to name a person was too general and therefore illegal. Taylor, *supra* at 32.

A few weeks later the last and most important of these cases, *Entick v. Carrington,* 19 Howell's St Tr 1029 (1765) — a case which has been frequently relied upon since by the Supreme Court of the United States — came before Lord Camden. *See* Hall, Search and Seizure 19 n 11 (1982), and cases cited therein. There, a warrant was issued for the arrest of John Entick, the reputed author of "seditious" literature, and the seizure of his books and papers. Once again, Lord Camden expressed his mistrust of warrants issued by the government:

> "Before I state the question, it will be necessary to describe the power claimed by this warrant in its full extent. If honestly exerted, it is a power to seize that man's papers, who is charged upon oath to be the author or publisher of seditious libel; if oppressively, it acts against every man who is so described in the warrant, though he be innocent. It is executed against the party, before he is heard or even summoned; and the information, as well as the informers, is unknown."

*Entick v. Carrington, supra* at 1064.

In England the general warrant principally involved political and religious offenses. In the American colonies the issue was raised in a somewhat different context, that of commerce. Justice Betty Roberts discussed this period in the history of search warrants in her dissent in *State v. Atkinson,* 298 Or 1, 15-16, 688 P2d 832 (1984):

"During colonial times, the British government enacted a variety of regulations restricting the colonies from trading with anyone but England or her dependencies. The Molasses Act of 1733, which imposed a prohibitive duty on molasses and sugar imported from the non-British West Indies, was one such restriction. The act was weakly enforced, however, until 1760, when England decided to halt the thriving illegal trade. A potent weapon was found in the writs of assistance, which granted to officers in broadly written terms the power to search any house or shop, to break open doors, chests and packages, and to remove prohibited goods. The effect of these writs was more invidious even than those used in England. In England they had been employed in particular libel cases and were, therefore, inherently limited. In the colonies the writs were not returnable after execution but were good as a continuous license during the lifetime of the sovereign. Lasson, The History and Development of the Fourth Amendment (1937 repr 1970).

"Reaction against the writs found its full expression in Massachusetts. In 1772 the citizens of Boston composed a document which identified those rights that the colonists regarded as fundamental, among others, freedom from writs of assistance, by which 'Officers * * * break thro' the sacred rights of the *Domicil,* ransack men's houses, destroy their securities, carry off their property, and * * * commit the most horred [*sic*] murders.' Schwartz, The Great Rights of Mankind 61 (1977). Two years later in a petition to the King for redress of grievances, the Continental Congress complained:

> " 'The officers of the customs are empowered to break open and enter houses, without the authority of any civil magistrate, founded on legal information.'

"Landynski, Search and Seizure and the Supreme Court, 37-38 (1966).

"In 1776, even before the Declaration of Independence, Virginia adopted a Constitution and Declaration of Rights, the first true bill of rights in the modern American sense. Many of the rights included in the Declaration extended well beyond those known in Britain at that time. One right was the guaranty of protection against general warrants:

> " '10. That general warrants, whereby any officer or messenger may be commanded to search suspected places without evidence of fact committed, or to seize any person or persons not named, or whose offence [sic] is not particularly described and supported by evidence,

are grievous and oppressive and ought not to be granted.'

"1 Schwartz, The Bill of Rights, A Documentary History 235 (1971). Seven of the eleven other colonies which subsequently adopted constitutions included provisions, similar to that of Virginia, barring the use of general warrants. Schwartz, The Great Rights of Mankind 88 (1977). * * *"

In 1787 delegates from the different states met in Philadelphia to ·compose a general constitution that would repair the structural defects of the Articles of Confederation; the convention adjourned, however, without including a bill of rights, and this omission was seized upon by antifederalists to discredit the constitution in subsequent ratifying conventions. Among those rights not guaranteed by this new instrument of national government was freedom from unreasonable searches and seizures. Elbridge Gerry, one of the leading antifederalists, wrote in 1788:

"There is no provision by a bill of rights to guard against the dangerous encroachments of power in too many instances to be named: but I cannot pass over in silence the insecurity in which we are left with regard to warrants unsupported by evidence — the daring experiment of granting writs of assistance in a former arbitrary administration is not yet forgotten in the [sic] Massachusetts; nor can we be so ungrateful to the memory of the patriots who counteracted their operation, as so soon after their manly exertions to save us from such a detestable instrument of arbitrary power, to subject ourselves to the insolence of any petty revenue officer to enter our houses, search, insult, and seize at pleasure."

1 Schwartz, The Bill of Rights, *supra* at 488-89. In Virginia, Patrick Henry urged the rejection of the constitution primarily because of the absence of a provision protecting against illegal searches, Landynski, *supra* at 40:

"A man may be seized, any property may be taken, in the most arbitrary manner, without any evidence or reason. Every thing the most sacred may be searched and ransacked by the strong hand of power. We have infinitely more reason to dread general warrants here than they have in England, because there, if a person be confined, liberty may be quickly obtained by the writ of *habeas corpus.* But here a man living many hundreds of miles from the judges may get in prison before he can get that writ."

III Elliot (ed), The Debates in the Several State Conventions on the Adoption of the Federal Constitution 461 (1861).[3]

The Fourth Amendment and its later counterparts in state constitutions, including Oregon's, resulted from repressive acts by government against the governed. Unwarranted searches for seditious literature in trunks, cabinets and homes; restriction of freedom of the press and expression; searches to control commerce and collect revenues; and searches for religious offenses, these were the evils complained of. The goals of constitutional search and seizure provisions are to restrain the government from using search and seizures to persecute nonconformists and repress the rights of the governed — rights such as freedom of speech and religion, the right to trial, the right to engage in commerce, and the right to be secure in one's home and person.

Many of the searches and seizures described above were not made as part of a criminal investigation, but as part of a plan of a repressive government. I do not maintain that our constitutional search and seizure provisions concern only searches and seizures made as part of a criminal investigation. I do maintain that the history of these provisions, reason and common sense, compel the conclusion that the terms "searches" and "seizures," as used in our constitutions, have a well understood and well defined meaning, at variance from the construction of the majority.

## HISTORICAL BACKGROUND OF LOCAL POLICE ORGANIZATIONS

Police organizations as we know them today did not exist in 1791 or 1859. Early on, between the 10th and 18th

---

[3] Julius J. Marke has written a book containing a fascinating, readable account of events concerning the infamous writ of assistance in the colonies. *See* Vignettes of Legal History 241-262 (1965).

These opinions of the Supreme Court of the United States contain a discussion of events leading to the adoption of the Fourth Amendment:

*Warden v. Hayden,* 387 US 294, 301-02, 317, 87 S Ct 1642, 18 L Ed 2d 782 (1967).

*Ker v. California,* 374 US 23, 47-51, 83 S Ct 1623, 10 L Ed 2d 726 (1963) (Brennan, J., dissenting).

*Marcus v. Search Warrant,* 367 US 717, 724-29, 815 S Ct 1708, 6 L Ed 2d 1127 (1961).

centuries, the principal responsibility of sheriffs and constables was to protect the king's interests. The sheriff's "original and primary function was to act as the agent in managing the estates of which the king was landlord." Cross, Eighteenth Century Documents Relating to the Royal Forests, The Sheriffs and Smuggling 15 (1928). The sheriff also had some judicial responsibilities. Cross states that "[i]n Edward's Laws c. 920, [the sheriff] appears as a 'primary' judge in all criminal matters in the local courts." Cross, *supra* at 16 (footnote omitted).

Even then, however, the sheriff had further duties, including the duty of keeping the peace. In some respects the sheriff remained the caretaker of the county. Not only was he to protect the public peace, but he was required to "take charge of all escheats, wrecks and estrays and the like." Harlow, Sheriffs Constables 2, § 2 (3d ed 1907). One writer described the duty of the sheriff as follows:

> "The sheriff, coroners and wreck masters of every county in which any wrecked property shall be found, when no owner, or other person entitled to possession of such property, shall appear, shall severally have power, and it shall be their duty to pursue all necessary measures for saving and securing such property; to take possession thereof, in whose hands soever the same may be, in the name of the people of this state; to cause the value thereof to be appraised by indifferent persons; and to keep the same in some safe place to answer to the claims of such persons as may thereafter appear entitled thereto."

Crocker, Sheriffs, Coroners and Constables 292, § 723 (1855) (footnote omitted). Similarly if property was alleged to be stolen and came into the sheriff's custody, the sheriff was to "hold the same, subject to the order of the officers authorized to direct the disposing of it." Crocker, *supra* at 45, § 81.

One precursor of the present-day police department was the London town watchman. The watch, which was eventually replaced by the London Metropolitan Police, was organized around parishes or neighborhoods and is remembered now as a poorly paid group "frequently made up of the aged and infirm, or persons moonlighting from their regular employment" who did little to get in the way of criminals. *See, e.g.,* Reppetto, The Blue Parade 3 (1978). Even so, one might argue that the watchmen, one of the first police in an urban

setting, were the first in England to have community care-taker duties. Under Charles II, the " 'Charlies' were * * * required to perform * * * duties of municipal housekeeping such as lighting lamps, calling the time, and reporting unsanitary conditions." *Id.*

Modern police forces as we know them today began to develop in the nineteenth century, both in Europe and in the United States. The early London Metropolitan Police may be credited with the "community service model" of "controlling crime and disorder." Reppetto, *supra* at 301. This model, also known as the "beat system," is as follows:

> "In the community service model * * * the essential idea is to assign a team of patrolmen and supervisors to a small area * * * to learn about the neighborhood. This approach is based on the assumption that if officers are encouraged to become familiar with the neighborhoods in which they work and to take larger responsibilities for following through on citizens' requests for assistance as well as on complaints of crime, they will win the confidence of those whom they are to protect and thereby elicit more cooperative assistance from the public and better intelligence about criminal activities * * *."

Wilson, Thinking about Crime 90-91 (1967) *quoted in* Reppetto, *supra* at 301-02.

The first London Metropolitan Police Officers, not unlike their later counterparts in Oregon, were not viewed as individuals invested with power beyond that of the ordinary citizen, that is, as stated by nineteenth century English jurist Sir James Fitzjames Stephen, "[a] policeman has no other right as to asking questions or compelling the attendance of witnesses than a private person has; in a word, with a few exceptions, he may be described as a person paid to perform as a matter of duty acts, which if he so minded, he might have done voluntarily." *Quoted in* Melville-Lee, A History of Police in England and Wales 333 (1901) and Reppetto, *supra* at 18.

Like England, in the United States the creation of public police resulted from safety concerns. Early on, the New England states had "watches" (supplemented by officers supported largely by fees for enforcement services); Boston created a watch in 1631 and New Amsterdam (New York) in 1643. Bayley, *Police History* in 3 Encyclopedia of Crime and Justice 1120, 1124 (1983). As was the case in England, various

types of law enforcement officials were created by local governments including marshalls, sheriffs and constables, all assisted by the *posse comitatus.* And like England, "[b]y the early nineteenth century, American law enforcement was a hodgepodge of small jurisdictions staffed by various officials with different powers, responsibilities, and legal standing."

The modern police force in the United States developed at about the same time as the London Metropolitan Police Force.

"The movement [toward unified police forces] began in Boston in 1837 and spread to New York in 1844 and to Philadelphia in 1854. By the 1870's almost all major American cities had municipal police forces. Several factors combined to produce this change. As in Great Britain, it had long been recognized that criminal investigation was haphazard, favoring those who could pay. Crime prevention by the police was negligible, carried out by unmotivated, untrained persons who generally could not find other work. The rapid growth of cities produced violence, crime, and vice, reflecting the breakdown of the customary social structures that ensure moral consensus and law-abiding behavior in small communities. However, the crucial impetus was probably the dramatic rise in urban mob violence. Rioting frequently broke out between Catholics and Protestants, immigrants and [N]ative Americans, and abolitionists and pro-slavery groups. Having at their disposal only ill-assorted and unorganized local officers or the state militia, cities could not maintain order. Slowly the realization grew that cities needed a standing force of police, centrally commanded, that would patrol regularly in order to prevent problems from developing, that would be large enough to deter a mob, and that would be expert in investigating criminal offenses."

*Id.* at 1124.

Hale, Police and Prison Cyclopedia (1896) contains an extensive discussion of the duties of nineteenth century police officers. Among Hale's description of the duties of the policemen are these:

"He shall furnish such information and render such aid to all persons, when requested, as is consistent with his duty.
* * *

"* * * * *

"He shall examine in the night-time all doors, gates, and

windows of dwellings and stores to see that they are properly secured, and, if not, give notice to the inmates, if any. Where the buildings are unoccupied he must make fast all doors and windows found open and notify the owners in the morning. He must take special notice of all vacant dwelling-houses to prevent depredations; be vigilant to prevent fire or waste of water; call attention of abutters to the state of the sidewalks where by snow, ice, or other cause they are rendered dangerous, or when obstructed by fuel, boxes, or other articles, or with goods or signs extending more than foot over the same; take note of all ashes, garbage, dead animals, or other offense matter thrown into the street, or when the street is used for washing carriages or horses or improperly obstructed thereby."

*Id.* at 36-37.

One writer states that the police receive many calls requesting assistance in non-criminal matters. Reiss, The Police and the Public 63-64 (1971). Today, modern police are regularly called upon to resolve domestic disputes, respond to reports of missing family members, answer questions of persons in need of information, aid the ill, take inebriated persons to detoxification centers (rather than to jail), and to work with social service agencies. *See id.* at 63. *See also* Goldstein, *Police Administration* in 3 Encyclopedia of Criminal Justice 1125, 1129 (1983); and *State v. Atkinson,* 298 Or 1, 8, 688 P2d 832 (1984) ("For various reasons of public necessity, it is sometimes necessary that automobiles be taken into government custody."); and *Nearing v. Weaver,* 295 Or 702, 704, 670 P2d 137 (1983) (Statute requires police to assist in domestic disturbances.)

The original grant of authority to the Oregon State Police provided:

"The department of state police and each of the members thereof shall be charged with the enforcement of all criminal laws. They shall have the powers now given to peace officers of the state, county and municipalities, and they are hereby authorized and empowered to prevent crime, to pursue and apprehend offenders and to obtain legal evidence necessary to insure the conviction in the courts of such offenders, to institute criminal proceedings, to execute any lawful warrant or order of arrest issued against any person or persons for any violation of the law, to make arrests without warrant for violations of the law committed in their presence, and for felonies

committed, the same as are or may be authorized for other peace officers; to give first aid to the injured; to succor the helpless, and to have in general the same powers and authority as those conferred by law upon sheriffs, police officers and constables. * * *"

Or Laws 1931, ch 139, § 9 (currently codified at ORS 181.030).

The foregoing is not intended to prove that police have greater authority than other citizens to render aid. The point is that their authority is not less than that of other citizens and that law enforcement officers have long been a traditional source of aid for citizens other than in a criminal law enforcement context.

## DISCUSSION OF
## "COMMUNITY CARETAKING FUNCTION"

The Court of Appeals reversed the decision of the trial court. It determined that the conduct of the deputies was proper because they were involved in a "community caretaking function." *State v. Bridewell*, 87 Or App 316, 322-23, 742 P2d 648 (1987).

The source of the term "community caretaking function" often is attributed to *Cady v. Dombrowski*, 413 US 433, 441, 93 S Ct 2523, 37 L Ed 2d 706 (1973), in which the court stated:

"Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."

Other examples abound in case law. Many involve the seizure of cars that need to be moved or taken into custody because the cars appear to be abandoned, or for other reasons. *See, e.g., Fallon v. State*, 725 P2d 603 (Okla Crim App 1986); *Robertson v. State*, 541 S W 2d 608 (Tex Crim App 1976). *See also State v. Atkinson*, 298 Or 1, 688 P2d 832 (1984).

The Rhode Island Court stated, in *State v. Cook*, 440 A 2d 137, 139 (RI 1982):

"Any police officer at any given time may perform the responsibilities of the office by acting as a domestic-relations counselor in an attempt to reconcile two belligerent spouses who at

some prior time had solemnly promised to love and honor each other, or as a midwife to a newcomer to this planet who cannot delay his or her appearance until the cruiser makes it to the hospital, or as a sympathetic emissary who has the unpleasant task of informing some citizen of the loss of a loved one, or even as a taker of measurements or the preparer of accident reports that may prove of value solely to some insurance adjuster. * * *"

I maintain that the initial entry upon the defendant's property was not a search. The entry on the premises was to investigate the report of a concerned person, fearful that her friend was hurt or injured. Entering property to find whether the concerns were well founded was not a "search" as that term was understood in the state and federal constitutions in 1791 and 1859 and is not a search within the present day meaning of that term.

A true "emergency" cannot be the test. In many cases, inquiry must be made to ascertain if there *is* an emergency. I assert that in the presence of facts suggesting to a reasonable person that there is a need to render aid or assistance, the police may enter premises to render such aid or assistance.

In entering the property of another, the law enforcement person has no greater authority than any citizen. The entry is the entry of a person who is privileged to enter another's land if it is or reasonably appears to be necessary to prevent serious harm to the other, his land or chattels. This is the rule (or privilege) applicable to persons generally, and law enforcement persons in the role of the deputies in this case, come within that rule.[4]

On a motion to suppress, in deciding whether the entry is privileged, the trial judge should decide the same question the trier of fact would decide in a civil trespass case

---

[4] Restatement (Second) of Torts section 197 provides:

"(1) One is privileged to enter to remain on land in the possession of another if it is or reasonably appears to be necessary to prevent serious harm to

"(a) the actor, or his land or chattels, or

"(b) the other or a third person, or the land or chattels of either, unless the actor knows or has reason to know that the one for whose benefit he enters is unwilling that he shall take such action.

"* * * * *"

against the person entering the land. If the entry is privileged, evidence obtained as a result of the exercise of the privilege would not be suppressed. If the entry is not privileged, the evidence would be suppressed. *See* Restatement (Second) of Torts § 197, comments *f, h,* and *j* (1965).

The privilege applies in this case. The friend reported death threats had been made against the defendant. There were reports that the place had been ransacked. The defendant's friend "had never been so scared in her life." She thought that "something had happened to Jon and she didn't know what."[5]

If the majority rule prevails, the assistance role of law enforcement personnel in this society will go downhill from here. The police cannot obtain a warrant for the entry. The majority admits as much; and without a warrant, the police are powerless. In the future police will tell such concerned citizens, "Sorry. We can't help you. We need a warrant and can't get one."

Our society in 1988 is an impersonal one. Many of us do not know the names of our next-door neighbors. Because of this, tasks that neighbors, friends or relatives may have performed in the past now fall to the police. In *State v. Delgado,* 298 Or 395, 403, 692 P2d 610 (1984), we held that the defendant's "right to bear arms" under Article I, section 27, of the Oregon Constitution extended to the possession of a switch blade knife in part because "the constitutional drafters * * * must have been aware that technological changes were occurring in weaponry * * *." Similarly, we should construe the search and seizure provisions of the constitution in light of present-day events.

### THE MOTION TO SUPPRESS AND THE TRIAL COURT'S FINDINGS

The defendant filed a motion to suppress that reads in part:

"Comes now the Defendant and hereby moves the court for an Order suppressing all illegally seized evidence, including but not limited to the following:

---

[5] The statements are taken from the transcript of testimony at the suppression hearing, not from the trial judge's findings.

"1. All Marijuana, Cannibis Moraceae, whether growing or dried;

"2. All equipment, containers, tools used for cultivation of Marijuana;

"3. All pictures taken at the scene; upon the grounds and for the reason that: there was no lawful warrant issued for this search and seizure, there was no probable cause for this search and seizure, and there was no lawful consent for this search and seizure, this search and seizure was not incident to any lawful purpose preceding arrest, and this search and seizure was not otherwise lawful.

"* * * * *

"Defendant further moves that the evidence be suppressed and that all information or knowledge gained either directly or indirectly as a result thereof be suppressed, and all statements be suppressed.

"* * * * *"

The trial court's findings in part read as follows:

"And the officers left the next morning, Deputy Prince [*sic:* French], and Deputy Wagner, and the Reserve Officer Young not feeling that it was any great emergency.

"They went to the main residence and walked east of the residence and saw that the dogs were tied up on the front porch without feed or water and appeared — and it appeared one of them was on a very short tether. The door was open and they walked by the dogs and called for Jon Bridewell, entered the house, again called, he wasn't there, and noted that clotheses [*sic*] — clothes, dishes, paper, books and garbage, and dog droppings were about the house. It looked ransacked although there were no drawers pulled out on any of the dressers or any of the cabinets.

"They did notice the empty holster there. There was no evidence of any spent pistol cartridges, no blood, or any other signs of violence in the home.

"And they called out for him and couldn't find him. They went upstairs and called and couldn't find him. And then they went outside and did a —more or less surveyed the premises.

"And they went to the shop. Deputy French went to the shop with Dave Young, which they described as being 125 yards from the main residence.

"And they got to the shop. Apparently they approached from the south end and both of — but both the doors that

were on the building were open, and heard a noise in there and determined that it was a small white goat mess — messing around in the shop building.

"And as they — But, did not call out for Bridewell. And they entered the south entrance. I understand these entrances are very large in the shop, large enough to accomodate [sic] a — a full-size truck.

"But, anyway they entered the northside of the shop and they — as they were in — and without calling out for Jon Bridewell. Then as they were entering the — the southside of the shop they walked near or past an open door where there was some light that was coming out and at that time Deputy French observed four marijuana plants and baskets and grow lights, and from his knowledge and training he test — he testified that he could readily identify them as marijuana and marijuana implements and pointed it out to Dave Young.

"At that time they called out to — for Mr. Bridewell and there was some commotion in that en — enclosed room containing the marijuana plants and he came out of the room and — and shut the door and asked them what their purpose was at the residence and they explained why they were there, and then they asked him to open the door and he said, "No, you need a warrant. And they said, "We don't need a warrant. We've seen it." And then he said, "Okay." And he opened the door and at that time they — or at that time they again viewed the marijuana plants. And later testimony was some 354 in number.

"* * * * *

"When the officers went to the Bridewell residence they had no intention whatever to look for plants or any evidence of any misdeeds * * *.

"* * * * *

"Now, the evidence — Okay. All the — It appears to the Court that at the time this welfare check occurred and specifically with respect to entry into the garage, there was no evidence of anyone in need of immediate aid. There was no compelling need assist [sic] any persons within or any urgent need to render aid and assistance. The officers told themselves they'd — Themselves, they told us that they didn't consider the matter to be an emergency situation.

"*And so the Court finds that there was no legal and valid intrusion into the shop.*

"* * * * *

*"And it's my finding that exigent circumstances did not exist for the seizure of the plants at that time and that the proper procedure would have been for the officers to have gone back and received a Search Warrant to search the room.* And so for that reason and the same way with searching the house and the pickups or any evidence of — of contraband.

"Mr. Bridewell was under arrest. He wasn't going anywhere and I don't think that the premises were in jeopardy. I don't think there was any [inaudible word] evidence that the evidence was going to be destroyed or that it would be lost.

"And so I'm going to allow the motion to suppress and will enter an order at this time.

"* * * * *" (Emphasis added.)

The suppression order provided: "IT IS ORDERED the Motions are allowed and all seized items are suppressed."

The majority believes that the trial court held that the initial entry to the defendant's premises was invalid and that the trial court ordered that all evidence — including the observation of the "four marijuana plants and baskets and grow lights" — be suppressed. I don't read the order that way.

The trial court found that "there was no legal and valid intrusion into the shop." I believe that the trial court did not intend to suppress, and did not order the suppression of the observation of the four marijuana plants, baskets and grow lights. However, I agree with the trial court that the later warrantless entry was impermissible.

The officers were removing the hat of an assister upon the land to render assistance and putting on the cap of a law enforcement officer searching for evidence of a crime. Their "privilege" was at an end when they saw that the defendant was safe. Their subsequent actions constituted a warrantless search and seizure. The state, whose burden it was, failed to establish an exigency excusing the obtaining of a warrant.

## CONCLUSION

As a judge, I am convinced that the majority is misreading the intent behind and the meaning of the search and seizure provisions of our constitutions. As a citizen I know that Oregonians will be less secure in their persons, houses, papers and effects under the rule stated by the majority than

under the rule I would apply. As a citizen, I'll learn not to turn to the police for assistance. I'll be better off calling Triple A.

Jones and Gillette, JJ., join in this opinion.