178 P.3d 250 (2008)
218 Or. App. 57
STATE of Oregon, Plaintiff-Respondent,
v.
Jay Charles FERRARA, Defendant-Appellant.
200400019; A126826.
Court of Appeals of Oregon.
Argued and Submitted March 30, 2007.
Decided February 13, 2008.
*251 Meredith Allen, Deputy Public Defender, argued the cause for appellant. With her on the brief were Ingrid Swenson, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.
Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before EDMONDS, Presiding Judge, and WOLLHEIM, Judge, and CARSON, Senior Judge.
WOLLHEIM, J.
After a trial to the court, defendant was convicted of one count of intentional murder with a firearm, ORS 163.115, ORS 161.610, and two counts of felon in possession of a firearm, ORS 166.270. He advances two assignments of error: (1) The trial court erred by ordering him to pay restitution of $20,000,[1] representing loss of support for the victim's minor child, and (2) the trial court erred by denying his motion to suppress evidence. We address defendant's second assignment of error first and affirm his conviction. However, because this record is insufficient to support the order of restitution, we vacate the sentences and remand for resentencing. ORS 138.222(5)(a).

MOTION TO SUPPRESS EVIDENCE
Defendant assigns error to the trial court's denial of his motion to suppress evidence. We review the denial of a motion to suppress for errors of law, deferring to the trial court's findings of historical fact when there is evidence in the record to support them. State v. Ehly, 317 Or. 66, 75, 854 P.2d 421 (1993).
The facts related to this assignment of error are undisputed. At approximately 10:00 p.m. on January 1, 2004, defendant called 9-1-1 and reported that his girlfriend had shot herself and needed assistance. At approximately 10:29 p.m.,[2] Cottage Grove police officers Skaggs and Timm arrived at the scene. They approached the trailer where defendant and his girlfriend lived and found the door ajar. They saw defendant kneeling over someone who was lying face-up on the floor. Defendant motioned for the officers to enter the home. Skaggs asked defendant what had happened, and defendant said that he did not know. When asked about a gun, defendant told one officer that there was no gun and told another officer that he did not know where the gun was.
*252 A short time thereafter, paramedics arrived, followed by Oregon State Trooper Rosage, who arrived at 10:33 p.m. In order to give the paramedics room to work, defendant left and waited in the driveway with Rosage, who reported a possible homicide to the police dispatcher. Defendant told Rosage that he and the victim had gone to town to buy candles and that when they got back, she had grabbed her chest, said that her heart hurt, and lay down on the floor. Defendant then began to walk away, and Rosage told him to stop because he needed to remain at the scene. Defendant became verbally aggressive toward Rosage.
In the meantime, Skaggs did a cursory search of the trailer. He found N, the victim's eight-year-old son, under a sleeping bag in the trailer's hallway. N told Skaggs that he had gone for a walk with defendant and that when they returned to the trailer his mother was hurt. He said that his mother and defendant had been arguing earlier that evening, but did not elaborate as to what they had been fighting about.
Within minutes of their arrival, the paramedics concluded that the victim was dead. The paramedics saw that the victim had a head wound with minimal bleeding, but they did not identify any possible causes of the wound.
At 10:37 p.m., Skaggs re-entered the home and used the telephone to advise the police dispatcher of the death. He then left the trailer, approached defendant, and told him that the victim was dead. Defendant cried out, became hostile, and stated that he did not know what he would do. Defendant began pacing and cursing loudly.
The next to arrive were sheriff's deputies Smith and Stone. Skaggs briefed them and then drove N to the sheriff's office in Eugene. Meanwhile, back at the trailer, Stone asked defendant to explain what was going on. Defendant was upset and did not respond and then challenged Rosage, the state trooper who had remained with defendant, to a fight.
Stone testified that there was probable cause to believe that defendant had committed a homicide and she directed that defendant be taken into custody. At approximately 11:00 p.m., sheriff's deputies Mann and Jessee arrived at the scene and transported defendant to the Lane County Sheriff's Office.
Shortly after 11:00 p.m., Stone learned from a neighbor that N had a sister who was as yet unaccounted for. Stone and Patterson entered the trailer to do a "sweep" for the sister but did not find her. While conducting the sweep, Stone took digital photographs and Patterson noticed a firearm of unknown type by the bed. Neither Stone nor Patterson was inside the trailer for more than three minutes. When they left the trailer, they taped off the scene.
Sheriff's detective Lamb arrived at approximately 12:30 a.m.[3] Stone explained to Lamb that the victim had no obvious trauma but that some blood was apparent at the side of her head, that there was a possibility that a gun was involved, and that defendant's explanations were inconsistent. Stone then showed Lamb the digital photographs from the earlier entry that displayed the victim's position on the floor. Lamb started a crime scene log and began setting up lighting equipment so that investigators would have light to work by until the electricity was restored.
At approximately 2:00 a.m., Deputy Medical Examiner Christensen arrived at the scene. By that time, the area had been secured and marked. Pursuant to the customary practice, Christensen contacted the officers at the scene and awaited law enforcement instructions before examining the body.
Next, Assistant District Attorney Gorham arrived and was briefed on the situation. Gorham then directed Christensen to examine the body. At approximately 2:50 a.m., Christensen began his examination of the body, including taking photographs. He was accompanied by Gorham and three sheriff's deputies, including Lamb, who held a flashlight for Christensen. Christensen and Lamb observed a wound on the victim's scalp *253 and Christensen noted that the hole was consistent with a bullet wound. At approximately 3:00 a.m., Christensen measured the victim's body temperature.
Lamb returned to the sheriff's office and prepared an affidavit for a search warrant. While Lamb was preparing the affidavit, sheriff's deputy Keetle asked defendant for consent to search the trailer, and defendant refused. Lamb presented the affidavit to a magistrate, who then issued a search warrant. When they executed the search warrant, the officers seized a shotgun found under the couch, two air rifles found in the back bedroom, and a revolver found under the front porch.
In total, there were five entries into the trailer: (1) the initial entry by the first-responders who had defendant's explicit consent to enter the trailer and render aid to the victim; (2) Skagg's brief re-entry to use the telephone to update the police dispatcher on the death; (3) the entry of Stone and Patterson to "sweep" for a second child; (4) the warrantless entry by the deputy medical examiner, assistant district attorney, and three sheriff's deputies;[4] and (5) the search executed pursuant to the warrant.
Before the trial, defendant filed a motion to suppress "any and all observations, mental impressions, or evidence that was seized at 3:00 a.m. * * *." He also argued that the 9:00 a.m. search, conducted pursuant to a search warrant, was based on the "fruit of [the] illegal [3:00 a.m.] entry" and that, as a result, the items that were seized at 9:00 a.m. should also be suppressed. The trial court denied defendant's motion and, on appeal, defendant renews his challenge to the 3:00 a.m. entry, and by extension, the search conducted pursuant to the search warrant.[5]
The state responds that the 3:00 a.m. entry was authorized by ORS 146.107, which provides, in part:
"(1) A medical examiner, deputy medical examiner or district attorney may enter any room, dwelling, building or other place in which the medical examiner, deputy medical examiner or district attorney has reasonable cause to believe that a body or evidence of the circumstances of death requiring investigation may be found.
"(2) If refused entry, the medical examiner, deputy medical examiner or district attorney may apply to any judge authorized to issue search warrants for an order to enter such premises, search for and seize a body or any evidence of the cause or manner of death.
"(3) Upon application supported by an affidavit setting forth facts and circumstances tending to show that a body or such evidence of death is in the place to be searched, the judge shall issue such order to enter and search and seize."
We pause to recall our standard of review. We review the denial of a motion to suppress for errors of law, deferring to the trial court's findings of historical fact when there is evidence in the record to support them. Ehly, 317 Or. at 75, 854 P.2d 421.
In this case, the trial court concluded, and we agree, that ORS 146.107 authorized the deputy medical examiner to enter the trailer because there was a body and the circumstances surrounding the death were unknown and suspicious. In making its ruling, the trial court explained:
"It strikes me that a reasonable inference from that statute is that [the deputy medical examiner] has the authority to at least conduct a cursory examination because based on his testimony, there were certainly things that needed to be done immediately, namely to take the temperature of the body and make other examinations in terms of the initial finding of cause of death.
"Obviously there's going to be later investigations that can take place in a better situation, but he's there with no lights, and got people holding flashlights, and he needs to make that cursory examination. *254 I think that's certainly allowed by the statute."[6]
We agree with the trial court that, under ORS 146.107, the deputy medical examiner had authority to enter the trailer to examine the body and investigate the "evidence of the circumstances surrounding the death." In addition, we conclude that the deputy medical examiner had a statutory duty to investigate and certify the cause and manner of the victim's death pursuant to ORS 146.090(1). That statute provides, in part:
"The medical examiner shall investigate and certify the cause and manner of all human deaths:
"(a) Apparently homicidal, suicidal or occurring under suspicious or unknown circumstances;
"* * * * *
"(d) Apparently accidental or following an injury[.]"
Thus, the legislature expressly delegated responsibility to the medical examiner to conduct the investigation that was done here. ORS 146.095.[7]
In addition, defendant asserts that, irrespective of any statutory authority of the deputy medical examiner to enter defendant's residence without a warrant pursuant to ORS 146.107, the 3:00 a.m. entry was an unreasonable search and seizure, in violation of Article I, section 9, of the Oregon Constitution[8] and the Fourth Amendment to the federal constitution.[9]
Article I, section 9, of the Oregon Constitution, guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." Under that section, a search conducted without a warrant is deemed per se unreasonable unless it "fall[s] within one of the few specifically established and carefully delineated exceptions to the warrant requirement." State v. Bridewell, 306 Or. 231, 235, 759 P.2d 1054 (1988). One exception to the warrant requirement allows police to conduct a search without a warrant if the search is both supported by probable cause and conducted under exigent circumstances. State v. Snow, 337 Or. 219, 223, 94 P.3d 872 (2004).
In arguing that the 3:00 a.m. search was unlawful, defendant relies on State v. Brothers, 4 Or.App. 253, 260, 478 P.2d 442 (1970), in which we stated that "to construe the statute[[10]] as authorizing medical investigators to conduct warrantless searches would be to give it unconstitutional construction." Defendant's reliance on Brothers is misplaced.
*255 In Brothers, the "search" at issue was conducted by the chief of police who responded to a call for assistance at a private residence. However, the chief responded to the call in his off-duty capacities as a private ambulance driver and a deputy medical examiner. Id. at 254-56, 478 P.2d 442. After transporting the victim to the hospital, where she later died, the chief made several telephone calls, including one to a subordinate police officer, who obtained a key to the residence, locked it, and delivered the key to the chief at the hospital. Several hours later, the chief returned to the residence, accompanied by a photographer and another police officer, to "take photographs and to search for and seize evidence of a crime." Id. at 255, 478 P.2d 442. The chief neither obtained a search warrant nor did he have consent of the victim's husband, who had remained at the hospital. During the search, the chief found, among other things, a rifle that was in a partially closed hallway closet, and not in plain view. The defendant  the victim's husband  sought to suppress evidence of the rifle as the "fruit of an illegal search." Id. at 256, 478 P.2d 442. We agreed with the defendant and wrote,
"It is obvious that the police did have probable cause to search defendant's apartment. A shooting had occurred there and it was logical to assume that a crime might have been committed and that evidence of that crime might still be on the premises.
"It is equally clear * * * that no special circumstances were present which would have permitted [the chief] to dispense with the necessity of obtaining a warrant. * * * The record does not disclose any evidence to support a contention that any evidence would have been lost if the police had taken the time to obtain a warrant. The record discloses no evidence to support a contention that an immediate search was necessary. * * *"
Id. at 258, 478 P.2d 442. Thus, in Brothers, we concluded that the medical examiner had authority only to preserve the evidence in the defendant's apartment, which was done when the police officer locked the apartment. Former ORS 146.450 did not authorize the medical examiner to search the defendant's apartment. Id. at 259-60, 478 P.2d 442.
In this case, it is also obvious that there was probable cause to enter the trailer: defendant had reported a shooting, there was a body in the trailer, the cause of death was unknown, the victim's scalp contained a wound of uncertain origin, and defendant gave inconsistent explanations about what happened. Here, a shooting had occurred, it was more likely than not that a crime had been committed, and evidence of that crime might still be on the premises.
Unlike in Brothers, however, there were exigent circumstances present that permitted the deputy medical examiner to dispense with the necessity to obtain a warrant. Despite the fact that the scene was secured, the evidence was in danger of degrading, and the medical examiner had a duty to take action in order to "preserve evidence relating to the cause and manner of death," including taking the temperature of the body. ORS 146.103(3).[11] Furthermore, in this case, the deputy medical examiner testified that his 3:00 a.m. entry was solely for the purpose of investigating the cause of death and that the police officers who accompanied him were there to assist him in that investigation. Unlike in Brothers, the deputy medical examiner's efforts here were limited to examining the body and investigating the cause of death, and did not involve searching the residence. In sum, we conclude that the 3:00 a.m. entry was lawful because probable cause and exigent circumstances existed to create an exception to the requirement for a search warrant.
Defendant also contends that the 3:00 a.m. entry ran afoul of the Fourth Amendment to the United States Constitution. We reject *256 defendant's federal constitutional arguments for the same reasons we reject his Oregon constitutional arguments. The trial court did not err in denying defendant's motion to suppress evidence.

RESTITUTION
Defendant's first assignment of error is that the trial court erred in awarding restitution in the sum of $20,000 for N's loss of his mother's support. The facts material to our review are undisputed. Defendant was convicted of murdering the victim, N's mother. The victim was not employed and, according to the trial court record, her only sources of income were social security disability benefits, public assistance, and food stamps.
Defendant argues that the trial court erred in sentencing defendant to pay $20,000 in restitution, representing N's loss of his mother's support, because the state did not offer any evidence regarding the amount of support N had received in the past or likely would have received from his mother in the future, had she lived. We review sentencing decisions, including restitution orders, for errors of law. State v. Howett, 184 Or.App. 352, 354, 56 P.3d 459 (2002).
A court's authority to impose restitution is governed by ORS 137.106. We begin by considering that statute. ORS 137.106(1)(a) (2003)[12] provided, in part:
"When a person is convicted of a crime * * * that has resulted in pecuniary damages, the district attorney shall investigate and present to the court, prior to the time of sentencing, evidence of the nature and amount of such damages. If the court finds from the evidence presented that a victim suffered pecuniary damages, in addition to any other sanction it may impose, the court shall:
"(a) Include in the judgment a requirement that the defendant pay the victim restitution in a specific amount that equals the full amount of the victim's pecuniary damages as determined by the court * * *."
(Emphasis added.)
We apply that statutory precept here. Defendant was convicted of murdering the victim, N's mother. The court imposed $20,000 in restitution for N's loss of the victim's support. Pursuant to ORS 137.106, restitution is authorized if (1) defendant's murder of the victim resulted in pecuniary damages to N, (2) the state investigated and presented evidence to the court of the nature and amount of N's pecuniary damages, and (3) the court found from that evidence that N suffered pecuniary damages.
Defendant argues that the trial court was limited by ORS 137.106 to ordering restitution only for pecuniary damages, which, pursuant to that statute, was the amount of support that the victim would have likely provided N had she lived. According to defendant, because the state presented no evidence to substantiate its claim of the amount of N's pecuniary damages, the order imposing $20,000 in restitution, representing N's loss of the victim's support, must be reversed.
The state counters that defendant "misunderstands the nature of pecuniary damages," and that, under Oregon common law, courts have long held that damages resulting from the loss of "`pecuniary benefits' are not dependent on actual earnings or monetary contributions to the surviving beneficiaries but include the `value of services which the beneficiary had a reasonable right to expect from the deceased.'" Durkoop v. Mishler et al, 233 Or. 243, 250-51, 378 P.2d 267 (1963).[13]
The state's argument encompasses a broader understanding of what constitutes pecuniary damages. We understand the state's argument to be that N's damages are pecuniary damages that can be presumed from the facts stated because: (1) the victim was N's custodial parent, (2) N *257 was eight years old when defendant murdered the victim, and (3) those facts are sufficient to support the trial court's order of restitution because "[p]arents are deemed to have a obligation to support their own children and, under child support rules, even unemployed parents are not excused from that obligation * * *."[14]
We also understand the state to advance a common-sense approach to the order of restitution. Here, the trial court ordered defendant to make his restitution payments to the Department of Justice Crime Victims' Compensation Fund, in the amount of $282 per month. The state reasons that, at $282 per month, defendant's annual restitution payments would be $3,384. At that rate, defendant could satisfy the $20,000 restitution obligation in less than six years. Given that N was eight years old when defendant murdered the victim, the $20,000 obligation would be satisfied before N reaches his twenty-first birthday. ORS 147.035(1)(b)(C); ORS 147.035(4). According to the state, "the $282 monthly payment comes nowhere close to fully and adequately supporting the boy."
Thus, the parties' dispute turns on the meaning of the term "pecuniary damages." Specifically, we must ascertain what the legislature intended by that term in the restitution statutes, ORS 137.103 to 137.109. PGE v. Bureau of Labor and Industries, 317 Or. 606, 610, 859 P.2d 1143 (1993). ORS 137.103(2) defines the term "pecuniary damages" to mean
"all special damages, but not general damages, which a person could recover against the defendant in a civil action arising out of the facts or events constituting the defendant's criminal activities and shall include, but not be limited to, the money equivalent of property taken, destroyed, broken or otherwise harmed, and losses such as medical expenses and costs of psychological treatment or counseling."
The meaning of pecuniary damages, then, turns on the meaning of "special damages" and "general damages." The legislature, however, did not define those terms. As a consequence, our task is to ascertain what the legislature intended by "special damages" and "general damages." Turning back to the statutory definition of pecuniary damages, the legislature's use of the terms "special damages" and "general damages" in ORS 137.103(2) directs us to civil law. As such, we next consider whether N could recover any damages against defendant in a wrongful death action  the civil analogue to defendant's criminal activities  and if so, the amount of those damages.[15]
Wrongful death actions are codified at ORS 30.020, which provides, in part, that an action may be brought "(1) When the death of a person is caused by the wrongful act or omission of another * * *." That statute goes on to provide:
"(2) In an action under this section damages may be awarded in an amount which:
"* * * * *
"(c) Justly, fairly and reasonably compensates for pecuniary loss to the decedent's estate;
"(d) Justly, fairly and reasonably compensates the decedent's spouse, children, stepchildren, stepparents and parents for pecuniary loss and for loss of the society, companionship and services of the decedent * * *."
*258 Thus, neither the text of the wrongful death statute, ORS 30.020, nor the text of the restitution statutes, ORS 137.103 to 137.109, aids in discerning what the legislature meant by the terms "special damages" or "general damages." As such, we apply the familiar PGE statutory construct to discern the legislature's intent in using those terms.
At the first level of the PGE analysis, we typically interpret the words of a statute using their "plain, natural, and ordinary meaning." PGE, 317 Or. at 611, 859 P.2d 1143. However, although the terms "special damages" and "general damages" each is composed of common individual words, those words used together "are not terms of `common usage' that we must interpret according to their `plain, natural, and ordinary meaning' at the initial level of our PGE analysis[.]" Tharp v. PSRB, 338 Or. 413, 423, 110 P.3d 103 (2005) (stating that a term of art is used in the context of the professional discipline from which it arises and has a well-established meaning in that discipline). The terms "special damages" and "general damages" are legal terms of art; that is, they have well-established legal meanings for which the legislature has used them. McIntire v. Forbes, 322 Or. 426, 431, 909 P.2d 846 (1996) (stating that first-level PGE analysis "includes reference to well-established legal meanings for terms that the legislature has used"); cf. Oakleaf Mobile Home Park v. Mancilla, 189 Or.App. 458, 465, 75 P.3d 908 (2003) (concluding that the term "damages" as used in another statute is a legal term of art).
In Parker v. Harris Pine Mills, Inc., 206 Or. 187, 208, 291 P.2d 709 (1955), the Supreme Court identified the well-established legal meanings for the terms "special damages" and "general damages" by citing Damages, 25 CJS 153 § 131. That treatise provided:
"Only the damages which are the necessary result of the acts complained of can be recovered under a plea of general damages. Hence, it is generally held that special damages, which are the natural but not necessary result of the wrongful acts or injury, must be particularly averred in the complaint to warrant proof of or recovery therefor, except where such damages are conclusively presumed from the facts stated."
In Whitman-McCoy v. Dept. of Corrections, 132 Or.App. 45, 50, 887 P.2d 375 (1994), this court recognized the continuing use of the term "special damages" to refer to those damages that are "`naturally, but not necessarily resulting from' the injury" and the term "general damages" to refer to damages that are "the natural and necessary result of the injury."[16]Id. at 50, 887 P.2d 375 (quoting Parker 206 Or. at 208, 291 P.2d 709). (Emphasis in original.)[17]
With those definitions in mind, we turn to the instant matter. Here, defendant argues that the state failed to present any evidence of the amount of support N would have received from the victim had she lived. Stated differently, defendant argues that the state failed to prove N's pecuniary damages and that inherent in the state's failure was its failure to specify, with sufficient particularity, *259 the value of those damages. As defendant's counsel argued at the restitution hearing:
"We object to the court imposing this support obligation and restitution. The statute is clear: the court is authorized to award what a civil court might call pecuniary damage as restitution in the case.
"* * * * *
"The court knows from the evidence that it heard in the case that [the victim] was never employed. She had income from a social security disability that was 4 or $500 a month.
"* * * * *
"[S]he never supported the child other than to the extent she supported the child from her social security income. * * *
"That's not pecuniary. Where is her tax return? Where do we see what her income was to order that, that would allow the court to order other than the pecuniary * * *? So I would argue it's improper for the court to award the support. The court doesn't have proof on this record to do that."
In sum, defendant argues that without proof of the amount of pecuniary benefit that N lost as a result of his mother's murder  damages that are natural, but not necessarily resulting from his mother's death  the trial court was without authority to order $20,000 in restitution for loss of support.
We agree with defendant that, under ORS 137.103(2), the state was required to prove some quantifiable and ascertainable damages that naturally flowed from N's mother's death, and that the state failed to offer any evidence in that regard. The state's construction of the statute  that a general sum of damages can be presumed from the murder of a parent  is inconsistent with the well-established meaning of the term special damages. Thus, the trial court erred in ordering restitution on this record. We vacate the sentences and remand for resentencing. ORS 138.222(5)(a).
To summarize, we conclude that the trial court correctly denied defendant's motion to suppress and we thus affirm the convictions. However, the trial court erred in imposing restitution because this record is insufficient to support the order of restitution.
Remanded for resentencing; otherwise affirmed.
NOTES
[1] Defendant was also ordered to pay $2,907, to cover the victim's funeral expenses. He does not challenge that portion of his sentence.
[2] The record indicates that the delay in arriving at the scene was caused by snowy and icy road conditions that forced the officers to park their cars some distance from defendant's trailer and proceed on foot. Also, the electricity was out and the neighborhood was dark, which further delayed the officers in locating the trailer.
[3] As noted earlier, defendant called 9-1-1 at 10:00 p.m. on January 1, 2004. The investigation continued throughout that night and into the next day, January 2, 2004.
[4] The entry that commenced at 2:50 a.m. by Christensen, Gorham, and the three sheriff's deputies is referred to as "the 3:00 a.m. entry" by both parties in their briefs, and we utilize that description hereafter.
[5] Defendant does not challenge the first three entries.
[6] Defendant did not identify precisely what evidence he sought to suppress in his motion. We understand that defendant challenges the findings made by the medical examiner. That understanding is in concert with the trial court: "And so I will not suppress the findings made by the medical examiner which I think are really the subject of the motion [to suppress]."
[7] ORS 146.095(1) provides:

"The district medical examiner and the district attorney for the county where the death occurs, as provided by ORS 146.100(2), shall be responsible for the investigation of all deaths requiring investigation."
[8] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause; supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."
[9] The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
[10] The relevant statute in Brothers was a different statute. Former ORS 146.450 (1961), repealed by Or. Laws 1973, ch. 408, § 35, which provided, in part:

"(1) The medical investigator or any of his deputies may enter any room, dwelling, building or other place in which the body of evidence of the death requiring investigation may be found.
"(2) To preserve evidence, the medical investigator or any of his deputies may take under their custody and close or lock any room, dwelling, building or other inclosure for a period of not more than five days."
[11] ORS 146.103(3) provides:

"A medical examiner, district attorney or deputy medical examiner shall take custody of or exercise control over the body, the effects of the deceased and any weapons * * * which the medical examiner, district attorney or deputy medical examiner has reason to believe were involved in the death, in order to preserve evidence relating to the cause and manner of death."
(Emphasis added.)
[12] The legislature amended the restitution statutes during the 2005 legislative session. See Or. Laws 2005, ch. 564, §§ 1-2. The 2003 version of the statutes were in effect at the time of the hearing in this case. Accordingly, all references herein are to the 2003 version of the statutes.
[13] We note that Durkoop was a civil action for wrongful death and was decided before the present restitution scheme was enacted in 1977. Or. Laws 1977, ch. 371, § 2.
[14] The state cites OAR XXX-XXX-XXXX, the scale used to determine child support obligations, as authority for its argument that "even unemployed parents are not excused from [the obligation to support their own children]." We do not address whether the Oregon Administrative Rules pertaining to child support obligations have any evidentiary weight in a criminal matter regarding the imposition of restitution. However, we note that the same Oregon Administrative Rules also provide that the presumption that an unemployed parent must meet minimum child support obligations "does not apply to a parent who is unable to work full-time due to a verified disability * * *." OAR XXX-XXX-XXXX(3) (Oct. 1, 2003). The victim's receipt of social security disability benefits is evidence that she had a verified disability. We do not include that exception to the child support rules to represent any determination as to whether the state's approach is correct.
[15] Both parties agree that the civil action counterpart to defendant's criminal activities is a wrongful death action under ORS 30.020.
[16] In Whitman-McCoy, we stated that, "[i]n 1987, the legislature changed the nomenclature for general and special damages for personal injury when it enacted ORS 18.560. Or. Laws 1987, ch. 774, § 6. That statute now describes `general damages' as `noneconomic damages,' and `special damages' as `economic damages[.]'" 132 Or.App. at 50, 887 P.2d 375.
[17] We note that the legislative history of the restitution scheme confirms that the legislature understood the terms "general" and "special" damages to have the meanings ascribed to those terms in Oregon case law. The present scheme was enacted in response to State v. Stalheim, 275 Or. 683, 686-87, 552 P.2d 829 (1976), in which the court reasoned that,

"[i]f the [restitution] statute is interpreted so broadly so as to permit the imposition of unliquidated damages, thus including such losses as pain and suffering, decreased earning capacity, loss of consortium and the like, the trial judge will be forced to make evaluations of losses usually reserved to civil juries." In responding to that decision, the drafters of the current scheme "took a very narrow position similar to the Stalheim decision, and it said only special damages, not general damages. * * *." Tape Recording, House Committee on Judiciary, Subcommittee on Corrections, H.B. 2012, Apr. 29, 1977, Tape 41, Side 1 (statement of Dennis Bromka, Legal Counsel for Interim Judiciary Committee).